UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LEE LAWMASTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:26-cv-923-SEB-MG |
| | ) | |
| KURT SPIVEY, in his individual and | ) | |
| official capacities, | ) | |
| | ) | |
| Defendant. | ) | |

**Plaintiff's Memorandum in Support of Motion for Preliminary Injunction**

**<u>Introduction</u>**

Following the indictment of former FBI Director James Comey for sharing a photograph of seashells that were arranged to spell "8647," Lee Lawmaster placed "86" with the name of elected officials on the officials' Facebook pages. This was pure exercise of his right to free expression as he was both expressing support for Mr. Comey and expressing dissatisfaction with the elected officials. After learning of the comment on the official Facebook page of the Indiana Attorney General, the office's Director of Investigations travelled to Mr. Lawmaster's home, presented him with an official badge, and proceeded to tell Mr. Lawmaster that he could be indicted for his comments and that he needed to "tone it down." Further, he made the ominous statement that "hopefully, we don't have to come back." As a result, Mr. Lawmaster has reasonably ceased expressive activity that is clearly protected by the First Amendment. He is entitled to a

[1]

preliminary injunction so that he may engage in this activity without fear of further of adverse action being taken against him.

## Facts[1]

Lee Lawmaster is a resident of Bloomington, Indiana. (Lawmaster Declaration, Dkt. 22-1 at 1 ¶ 1). He is an active user of social media and, among other things, maintains a Facebook page. (*Id.* at 1 ¶ 2). He has also maintained a blog in the past where he comments on many things, including current events and social issues. (*Id.* at 1 ¶ 4). He is interested in politics and current events and his Facebook page reflects this. (*Id.* at 1 ¶ 3). While he does not "follow" Attorney General Rokita or many other political figures on Facebook, posts from these persons often appear in his Facebook newsfeed. (*Id.*). He assumes that this is the result of Facebook's algorithm given his political commentary on that medium or in other online forums. (*Id.*). He will review these posts and if they anger or frustrate him he may mark them as something he dies not want to see in his Facebook feed, although this may not result in the posts disappearing. (*Id.*). He may also comment on them and certainly wants the ability to comment on them in the future. (*Id.*).

On April 28, 2026, former FBI Director James Comey was indicted on charges of threatening the President of the United States because he had posted a photograph of seashells arranged to spell "8647" on social media. *United States of America v. James Brian Comey Jr.*, No. 4:26-CR-16-FL-RN, Dkt. No. 1 (E.D.N.C. Apr. 28, 2026). When Mr.

---

[1]    Plaintiff reserves the right to submit additional facts if they are discovered.

[2]

Lawmaster was a young child his grandparents frequently took him to a diner so he is well aware that the term "86" means to remove something from the menu because the item is no longer available. (Dkt. 22-1 at 2 ¶ 6). He therefore considered Mr. Comey's indictment to be both ridiculous and outrageous as the term "86" is not a true threat of any kind and the Government's indictment clearly violated the First Amendment. (*Id.* at 2 ¶ 7). Mr. Lawmaster believes that Americans' basic rights are under attack, particularly their First Amendment rights. (*Id.* at 2 ¶ 8).

To express his solidarity with Mr. Comey and to protest what he believed to be the objectionable policies and views of a number of elected officials whom he believes support the current administration in Washington, Mr. Lawmaster proceeded, beginning on April 29, 2026, to post "86" with the elected officials' names on a number of the officials' Facebook pages, including Attorney General Todd Rokita; Lt. Governor Micah Beckwith; Senators Todd Young, Jim Banks, and Bernie Moreno; and United States Representatives Clay Fuller and Erin Houchin. (*Id.* at 2-3 ¶¶ 9-10). He also posted the same comment on the Facebook pages of the United States Department of Justice and Department of Education. (*Id.* at 2-3 ¶ 10). His purpose in the making these comments was to express his displeasure with the elected officials' and government departments' position and to express his opinion that the public officials and the offices should be thrown out or removed, and that the leadership of the offices named should likewise be changed. (*Id.* at 3 ¶ 11). His displeasure at the officials' policies can be seen from the three

[3]

"86" comments that he made to the Attorney General's Facebook page that are all in response to posts regarding policies that he believed the Attorney General supported: policies that hurt the environment, anti-LGBTQ+ sentiment, and Indiana's new law targeting employers of undocumented immigrants. (*Id.* at 3 ¶ 12; at 7-9[2]). He also made the comments to show his support for Mr. Comey and to demonstrate that the term "86" was not a threat, but merely a statement of opposition to the official or office named. (*Id.* at 3 ¶ 13). Mr. Lawmaster's comments at issue did not include any language or elaboration other than "86" with the official or office named. (*Id.* at 2-3 ¶¶ 9, 14).

The only response that he received to any of the comments was from the Indiana Attorney General's Office, which was made aware by a constituent of the following April 30, 2026 comment by Mr. Lawmaster. (*Id.* at 3 ¶ 15; Deposition of Kurt Spivey, Dkt. 22-2 at 31:11-20).



(*Id.* at 338).

The existence of this comment was reported by the constituent to the Attorney

---

[2] The page numbers listed in this memorandum are as assigned by this Court's electronic filing system.

General's Executive Protection Director who passed it on to Kurt Spivey, the Office of the Attorney General's Director of Investigations in a text message that put no context to the comment. (*Id.* at 4:9-12, 31:15 – 32:11; 338).[3] Director Spivey has a long history in law enforcement, including two stints at the now-Indianapolis Metropolitan Police Department, totaling more than 25 years, as well as serving as the Chief of Police for the Martinsville Police Department. (*Id.* at 16:9 – 17:23). He continues to be a certified police officer and possesses arrest powers under Indiana law. (*Id.* at 20:21 – 21:24).

Director Spivey heads the Investigations Unit in the Office of the Attorney General, which includes the special investigations unit and tort claims unit. (*Id.* at 14:2 – 15:1). In addition to tort claims, the Investigations Unit investigates initiatives of the Attorney General including voter fraud, the unlawful employment of undocumented workers, and human trafficking. (*Id.* at 26:17 - 28:5). It also investigates threats to the Attorney General and other persons and entities. (*Id.* at 26:17-19, 27:19 – 28:2). The threat investigations may result in referrals to prosecutors for investigation and possible prosecution. (*Id.* at 28:2-14). Director Spivey has only been in his position since April of 2026, but he has been briefed about eight threat investigations. (*Id.* at 7:19 – 8:3; 27:8 –28:4). Three of the threat cases have been referred to prosecutors and at the current time have resulted in two prosecutions. (*Id.* at 27:8-28:4). The threat investigations included two that concerned

---

[3]    Director Spivey testified in both his individual and official capacities and a designate of the Office of the Attorney General. (Dkt. 22-2 at 6:6-21, 93, 346)

social media. (*Id.* at 27:19-23).

After being apprised of Mr. Lawmaster's "86" comment on the Attorney General's Facebook page, Director Spivey made sure that his supervisor, who reports directly to the Attorney General, was aware of "what we had" and determined to investigate whether the comment was a "true threat." (*Id.* at 10:18 – 11:14; 32:4-13; 39:5-25). Director Spivey is aware that the term "86" "came from the restaurant industry and had to do with removing items that were either sold out or no longer available," but as "humans aren't on menus," concluded that a deeper investigation of Mr. Lawmaster's post was warranted to determine if it was a true threat. (*Id.* at 38:5 – 39:25).

Therefore, Director Spivey decided to visit Mr. Lawmaster to investigate the matter. (*Id.* at 40:1 – 41:3). Before leaving, Director Spivey reviewed Mr. Lawmaster's recent Facebook activity, although the Attorney General's Office had collected the contents of Mr. Lawmaster's Facebook page dating back to 2011. (*Id.* at 42:17 – 44:23). He knew that Mr. Lawmaster had made several "86" comments but does not recall how many he had seen. (*Id.* at 45:13-17; 64:7 – 65:6). All he knew was that there was "political rhetoric" on his Facebook page. (*Id.* at 64:7 – 65:6). In his review he did not see anything that raised "red flags." (*Id.* at 45:9-12). He did not review any other part of Mr. Lawmaster's online activity. (*Id.* 44:11-17). Prior to the visit, Director Spivey did not receive anything in writing concerning Mr. Lawmaster, but he was informed that Mr.

Lawmaster had a domestic violence incident in the past. (*Id.* at 36:19 – 37:9).[4]

Director Spivey therefore went to Mr. Lawmaster's home in Bloomington. (Dkt. 22-1 at 3 ¶ 15). Director Spivey carries two badges, one that has marked on it "Police" and the other says "Chief," "Attorney General's Investigation Division," and "Investigator." (Dkt. 22-2 at 19:4 – 20:11; 62:9 – 63:21). Director Spivey uses the "police" badge when he is conducting a criminal investigation. (*Id.* at 19:18-21). The print on the badge is small. (*Id.* at 63:15). The investigator badge looks like a badge that a police officer would carry. (Dkt. 22-1 at 4 ¶ 18). He was "very likely" carrying a weapon that day. (Dkt. 22-2 at 20:14-20).

The interaction between Director Spivey and Mr. Lawmaster was captured on an audio recording device that Director Spivey carried (*id.* at 9:13-17; 12:25 – 13:16; 98) as well as on Mr. Lawmaster's door-bell camera. (Dkt. 22-1 at 4 ¶ 17; Dkt. 22-2 at 12:5 – 13:15; 97[5]). As can be seen from the video, Director Spivey identifies himself as an investigator from the Attorney General's Office and displays his badge. (Dkt. 22-2 at 97). Mr.

---

[4]    After Director Spivey visited with Mr. Lawmaster, he was provided with a "Security Risk Report" on Mr. Lawmaster that disclosed that he was convicted of domestic battery and battery resulting in bodily injury after misdemeanor guilty pleas in 2016 and that conviction was vacated and dismissed in 2017. (Dkt. 22-2 at 33:10-14; 34:8-14; 101). The report contained Mr. Lawmaster's "86" Facebook comment. (*Id.* at 103).

[5]    Dkt. 22-2 at 97 is the video that was introduced into evidence in the deposition as Exhibit 2 and Dkt. 22-2 at 98 is the audio recording that was introduced in the deposition as Exhibit 3. They have been placed onto a USB drive that is being manually filed today pursuant to Local Rule 5-2.

Lawmaster, seeing the badge and that Director Spivey was from the Attorney General's Office, assumed that Director Spivey was a police officer of some type. (22-1 at 4 ¶ 18).

The entirety of the interaction between Director Spivey and Mr. Lawmaster is as follows:[6]

| | |
|---|---|
| Spivey: | Hi. |
| Lawmaster: | Hi. |
| Spivey: | Lee? |
| Lawmaster: | Yeah. |
| Spivey: | How are you? |
| Lee: | Not bad. Yourself? |
| Spivey: | Good, good. My name's Kurt Spivey, and I'm an investigator with the Attorney General's office – |
| Lawmaster: | Um-hm. |
| Spivey: | -here to talk to you about some of your internet activity. |
| Lawmaster: | Yeah. |
| Spivey: | Okay? |
| Lawmaster: | Yeah. |
| Spivey: | A post you had made recently? Do you know what I'm talking about? |
| Lawmaster: | Yeah. |
| Spivey: | Mmkay. Do you remember what you posted? |
| Lawmaster: | 86 somebody. |
| Spivey: | You know what that means? |
| Lawmaster: | No. |
| Spivey: | No? Are you following the news with the Comey investigation and everything on – on the news about the previous FBI director being indicted over using that term with President Trump? |
| Lawmaster: | Yeah, I heard about it. |
| Spivey: | Okay, so you're aware of it. So you understand that that's what the term '86' means? |
| Lawmaster: | Just means get rid of. |
| Spivey: | Okay. Let's you and I have a candid talk, okay? |

---

[6]    This transcription is from Director Spivey's audio (Dkt. 22-2 at 98) as the audio is slightly better than that from the door camera.

| | |
|---|---|
| Lawmaster: | Okay. |
| Spivey: | You have the right to freedom of speech. |
| Lawmaster: | Mm-hm. |
| Spivey: | You have the right to say what you want. You have the right to have whatever opinion you want. I understand that. I respect it. Okay? |
| Lawmaster: | Mm-hm. |
| Spivey: | But you've crossed the line - |
| Lawmaster: | Okay. |
| Spivey: | - with a threat like that. You know, maybe you and I can come to an agreement that we kind of tone down the political rhetoric a little bit. |
| Lawmaster: | Mm-hm. |
| Spivey: | Okay? Alright? |
| Lawmaster: | Okay. |
| Spivey: | When someone comes knocking on your door, obviously it's starting to go a little too far. |
| Lawmaster: | Mm-hm. |
| Spivey: | Is that fair enough? |
| Lawmaster: | Fair enough. |
| Spivey: | Okay, how about this. Let's – uh – post your stuff, do your thing, you know, express your opinion, but when you start crossing that line that could be perceived as a threat, then we've got issues and problems, right? Listen, if Comey was indicted, we could easily indict you over this today. Alright? |
| Lawmaster: | Mm-hm. |
| Spivey: | We don't need to do that, right? |
| Lawmaster: | Right. |
| Spivey: | Okay, how about if you agree to tone it down a little bit, I can go check a box saying you and I have had a talk – |
| Lawmaster: | Mm-hm. |
| Spivey: | - we've come to an agreement, and maybe we can, like, let this one slide. |
| Lawmaster: | Okay. |
| Spivey: | That sound fair? |
| Lawmaster: | Fair. |
| Spivey: | Okay. Alright. Now, hopefully, we don't have to come back? Cool? |
| Lawmaster: | Cool. |
| Spivey: | Thank you, sir. |
| Lawmaster: | No problem. |
| Spivey: | Let's - Let's consider this issue, uh, put away. Okay? |
| Lawmaster: | Okay. |

[9]

Spivey:        And let's just, uh, tone down that rhetoric a little bit, alright?
Lawmaster:  Will do.
Spivey:        Okay. Have a good day.
Lawmaster:  You, too.
Spivey: Okay. Take care.
Lawmaster:  You, too.

(Dkt. 22-2 at 98). Following this conversation, Director Spivey, out of the presence of Mr.

Lawmaster, stated the following into his recorder.

Subject was cooperative, understanding, uh, we seemed to have an agreement that he would tone that down a little bit, and, um, hopefully that's the end of this with, uh, Lee Lawmaster.

(*Id.*; Dkt. 22-1 at 4 ¶ 17).

The "threat" to which Director Spivey refers in his discussion with Mr. Lawmaster

is the "86" comment on the Attorney General's Facebook page. (Dkt. 22-2 at 64:5-6).[7] And

Director Spivey agreed that when he stated that "when you start crossing that line, that

could be perceived as a threat, then we've got issues . . ." the term "we" refers to "State

---

[7]        In his deposition, Director Spivey expressed his belief that some point he believed that Mr. Lawmaster's post was tied in with another message from a social media user identified as "The Hound" who had made a separate social media post that had also been sent to Director Spivey had been sent by an employee of the Attorney General's Office. (Dkt. 22-2 at 338**).** However, that message was obviously just copied into the text message thread. Elsewhere in his deposition, Director Spivey noted that it was only Mr. Lawmaster's Facebook comment that had caused the investigation. (*Id.* at 33:24 – 34:4). And this is the only comment that is noted in the security risk report that was compiled by the Attorney General's office concerning Mr. Lawmaster. (*Id.* at 103). The post from "The Hound" is clearly not a Facebook post as it was sent not to Attorney General Rokita's Facebook page but to @AGToddRokita. (*Id.* at 338). It appears to have been copied into the text message that a person in the Attorney General's office sent to Director Spivey. Mr. Lawmaster has not used Twitter or "X" for years and is not familiar with "The Hound." (Dkt. 22-1 at 6 ¶ 28 ). In any event, Director Spivey did not mention "The Hound" to Mr. Lawmaster as he considered them to be two separate issues and does not now believe they are connected in any way. (Dkt. 22-2 at 71:22 – 72:24).

law enforcement as a whole." (*Id.* at 72:13-23). Moreover, Director Spivey did not specify where the "line" was that Mr. Lawmaster could not cross in the future.

Mr. Lawmaster understood from his conversation with Director Spivey that he had done something that a law enforcement officer employed by the State of Indiana had said might subject him to criminal prosecution, that he had crossed a line by posting "86" and had gone too far, and that if he did it again "we" might have to visit him again—so he better tone it down. (Dkt. 22-1 at 4 ¶ 19). Moreover, the threat that if Mr. Lawmaster did something again that crossed the "line," without any explanation of where the "line" is, left Mr. Lawmaster with the clear understanding that he needed to "tone" down any and all "political rhetoric" to stay clear of that non-defined "line." (*Id.* at  4 ¶ 20).[8]

As all Mr. Lawmaster was doing was making comments that said "86," he understood Director Spivey to be saying that Mr. Lawmaster had to stop making those comments. (*Id.* at 5 ¶ 21). Moreover, as Director Spivey indicated that Mr. Lawmaster had crossed some line by making the "86" comments, Mr. Lawmaster understood that other

---

[8]     Nevertheless, despite the language that Director Spivey used and its clear tenor, he now contends that the conversation was designed to convey the message that the issue was over. (Dkt. 22-2 at 72:24 – 74:22). But his words, and the context in which they were delivered, contradicts this after-the-fact explanation. Director Spivey did not tell Mr. Lawmaster that everything was fine and that he was free to proceed as he had been proceeding. Instead, he warned Mr. Lawmaster that he needed to down his rhetoric so that "we don't have to come back." (*Id*. at 98). This threat of future involvement with the Attorney General's Office contradicts Director Spivey's sanguine explanation. Indeed, upon learning from a colleague at the Attorney General's office that Mr. Lawmaster had posted another "Rokita-86" comments 20 minutes before Director Spivey visited Mr. Lawmaster, Director Spivey texted the colleague, "[l]et's see if [he] post (sic) anything else maybe we'll monitor." (*Id*. at 340). The threat of future monitoring demonstrates that Mr. Lawmaster continued to remain at risk is he "post[s] anything else."

[11]

political comments could be considered by the Office of the Attorney General and law enforcement as crossing the "line" into criminal behavior. (*Id.* at 5 ¶22). Mr. Lawmaster has no idea where Director Spivey and the Office of the Attorney General believes that line to be and Director Spivey certainly did not provide this information to Mr. Lawmaster. (*Id.*).

What Mr. Lawmaster did understand is that he had been directed to "tone down" his political rhetoric. (*Id.* at 5 ¶ 23). Not surprisingly, he has done exactly that. (*Id.*) Not only has Mr. Lawmaster completely ceased commenting "86"on elected official's Facebook pages or any of their other social media sites, but he has ceased commenting on official's sites altogether, although he certainly would like the ability to make comments in the future. (*Id.* at 5 ¶¶ 24-25). He does not want to approach the line that Director Spivey said exists and court further involvement with law enforcement or worse, and he therefore has chosen to censor himself rather than face that risk. (*Id.* at 5 ¶ 26)

<u>**The preliminary injunction standard**</u>

A court must weigh several factors in the preliminary injunction determination:

(1) whether the plaintiff has established a prima facie case, thus demonstrating at least a reasonable likelihood of success at trial;

(2) whether the plaintiff's remedies at law are inadequate, thus causing irreparable harm pending the resolution of the substantive action if the injunction does not issue;

(3) whether the threatened injury to the plaintiff outweighs the threatened harm the grant of the injunction may inflict on the defendant; and

[12]

(4) whether, by the grant of the preliminary injunction, the public interest would be disserved.

*See, e.g., Baja Contractors, Inc. v. City of Chicago*, 830 F.2d 667, 675 (7th Cir. 1987). The heart of this test, however, is "a comparison of the likelihood, and the gravity of two types of error: erroneously granting a preliminary injunction, and erroneously denying it." *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 590 (7th Cir. 1984) (citation omitted). Thus, "the more likely [the preliminary injunction movant] is to win, the less the balance of harms must weigh in his favor." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015).

## Argument

### I.   Mr. Lawmaster is likely to prevail on the merits of his First Amendment claim

"It is not permitted to employ threats to squelch the free speech of private citizens." *Backpage.com, LLC v. Dart*, 807 F.3d 229, 235 (7th Cir. 2015). Out of necessity, Mr. Lawmaster addresses both his standing to pursue injunctive relief and the merits of his First Amendment claim in detail below. Nonetheless, in many ways, this entire case can be resolved by that simple observation.

### A.   Mr. Lawmaster has standing to pursue injunctive relief

It is perhaps atypical for a plaintiff to affirmatively brief his standing to pursue his claim for injunctive relief. Nonetheless, given Director Spivey's lengthy contention in his now-moot request for dismissal that this Court lacks jurisdiction (*see* Dkt. 20 at 7-17), it is

[13]

appropriate to address the issue at the outset. Of course, to establish standing, a plaintiff (a) must suffer an "injury in fact" (b) that is "fairly traceable" to the conduct of the defendant and (c) that will likely be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (cleaned up). This test is plainly met here.

### 1.    Mr. Lawmaster has suffered and is suffering injury in fact

A federal plaintiff "need not wait for the damage to occur before filing suit," *Mahmoud v. Taylor*, 606 U.S. 522, 560 (2025) (citation omitted), but instead may demonstrate "actual or imminent injury," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quotation and citation omitted). In the First Amendment context, a plaintiff who has not yet suffered an "enforcement action" may make this showing in one of two ways:

> First, a plaintiff may show an intention to engage in a course of conduct arguably affected by a policy, and that he faces a credible threat that the policy will be enforced against him when he does. Second, a plaintiff may show a chilling effect on his speech that is objectively reasonable, and that he self-censors as a result.

*Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020) (citations omitted). Here, Mr. Lawmaster has demonstrated both an objectively reasonable chilling effect on his speech and a credible threat that Director Spivey will seek to enforce his explicit threats.

a.    <u>Chilling Effect.</u>    There is no doubt that Mr. Lawmaster's speech has been "chilled": since Director Spivey's visit, he has refrained from posting additional "86" comments to social media and from otherwise posting to officials' Facebook pages out of

fear of retribution, even though he would like to do so. (Dkt. 22-1 at 5 ¶¶ 24-26). The only question, therefore, is whether this self-censorship is reasonable. Plainly, it is.

Consider this portion of his interaction with Director Spivey:

Spivey:      "[W]hen you start crossing that line that could be perceived as a threat, then we've got issues and problems, right? Listen, if Comey was indicted, we could easily indict you over this today. Alright?
Lawmaster:  Mm-hm.
Spivey:      We don't need to do that, right?
Lawmaster:  Right.
Spivey:      Okay, how about you agree to tone it down a little bit, I can go check a box saying you and I have had a talk –
Lawmaster:  Mm-hm.
Spivey:      – we've come to an agreement, and I maybe we can, like, let this one slide. Does that sound fair?
Lawmaster:  Mm-hm.

(Dkt. 22-2 at 98). In other words, after being shown a badge, Mr. Lawmaster was told explicitly—by the Director of Investigations for the highest legal officer in Indiana—that his "86" comments constituted criminal activity (*"we could easily indict you over this today"*) but that, *if* he stopped posting those comments (*"tone it down a little bit"*), enforcement action would not be taken against him (*"I can let this one slide"*). The reasonableness of his decision to comply with Director Spivey's demands is self-evident.

Whether or not Director Spivey had the authority to follow through on his threats is beside the point. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66 (1963) ("This contention, premised on the Commission's want of power to apply formal legal sanctions [for the distribution of obscenity], is untenable."); *Killeen*, 968 F.3d at 642 ("The fact that a public-official defendant lacks direct regulatory or decisionmaking authority is not

[15]

necessarily dispositive.") (cleaned up). Rather,

> [w]hat matters is the distinction between attempts to convince and attempts to coerce. A public-official defendant who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights, regardless of whether the threatened punishment comes in the form of the use (or, misuse) of the defendant's direct regulatory or decisionmaking authority over the plaintiff, or in some less-direct form.

*Backpage.com*, 807 F.3d at 230-31 (quoting *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003) (per curiam)). Director Spivey did not engage Mr. Lawmaster in a political debate (an "attempt to convince") nor did he make any effort to obtain additional information (an actual investigation). Rather, he informed Mr. Lawmaster that he could be indicted for threatening a public official but that he would not be if he agreed modify—or cease—his speech. By anyone's definition, that is an "attempt to coerce."

This conclusion should not be lost in legal niceties. In Director Spivey's estimation, without violating the First Amendment, he may travel, armed and unannounced, to the residence of any private Hoosier he desires, identify himself as an investigator for the highest legal office in Indiana, flash a badge, and tell them that they are subject to indictment if they do not cease their speech activity. This form of lawless coercion "provides no safeguards whatever against the suppression of . . . constitutionally protected[] matter" and "creates hazards to protected freedoms markedly greater than those that attend reliance upon the criminal law." *Bantam Books*, 372 U.S. at 70. Were it permissible, it would represent "a formula for permitting unauthorized, unregulated, foolproof, lawless government coercion." *Backpage.com*, 807 F.3d at 237. It is not

[16]

permissible.

  b.  <u>Credible threat.</u>  Because Mr. Lawmaster has demonstrated an objectively reasonable chill on his speech, there is no need for this Court to also determine whether there exists a "credible threat" that Director Spivey's directive will be enforced against him. Nonetheless, this threat exists.

  To be sure, neither Director Spivey nor the Indiana Attorney General may have legal authority to indict Mr. Lawmaster—that authority belongs to county prosecutors. But Director Spivey *does* have arrest powers under Indiana law (Dkt. 22-2 at 20:21 – 21:24) and certainly has authority to refer Mr. Lawmaster for prosecution, and a plaintiff need not "first expose himself to actual arrest or prosecution to be entitled to challenge" governmental action, *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)); *see also, e.g.*, *American Civil Liberties Union v. Alvarez*, 679 F.3d 583, 591 (7th Cir. 2012) ("[A] person need not risk arrest before bringing a pre-enforcement challenge under the First Amendment.") (quoting *Schirmer v. Nagode*, 621 F.3d 581, 586 (7th Cir. 2010)). This is not a case where a plaintiff "do[es] not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible." *Babbitt*, 442 U.S. at 298-99 (citation omitted). This is a case where Mr. Lawmaster has been explicitly and unequivocally "threatened with prosecution" by someone with the authority to place him under arrest. Having taken the position that Mr. Lawmaster's "86" comments are illegal, the "credible

[17]

threat" is inherent in Director Spivey's power to do something about it.

### 2. The remaining elements of the standing inquiry are met

Given that Mr. Lawmaster is suffering injury-in-fact, the causation and redressability prongs of the standing analysis are easily met.

First, Mr. Lawmaster's injury has plainly been caused by Director Spivey's actions: it was Director Spivey who threatened him with indictment and demanded that he alter his speech activity. Even in seeking dismissal of Mr. Lawmaster's original complaint, Director Spivey did not contend that he fails to satisfy Article III's causation requirement

And second, Mr. Lawmaster's injury is redressable by a favorable decision: this Court can order Director Spivey to "take no actions, formal or informal, to coerce or threaten"—and to take no other action against—Mr. Lawmaster as a result of his "86" comments on social media. The quotation in the preceding sentence is from the injunction issued by the Seventh Circuit in *Backpage.com*, 807 F.3d at 239, and so there can be no doubt that a similar injunction is within this Court's authority. With such an injunction, Mr. Lawmaster can begin to again exercise his First Amendment rights by making comments on government officials' Facebook pages.

### B. Mr. Lawmaster's First Amendment rights are being violated

"As a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content. *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) (cleaned up). All speech is presumed to be

[18]

protected unless it falls into one of the very few, "well-defined and narrowly limited" categories of unprotected speech such as obscenity, incitement, or true threats. *U.S. v. Stevens*, 559 U.S. 460, 468-69 (2010) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942)). True threats are "serious expression[s]" conveying that a speaker means to "commit an act of unlawful violence" evaluated under a subjective recklessness standard. *Counterman v. Colorado*, 600 U.S. 66, 74, 79 (2023) (citing *Virginia v. Black*, 538 U.S. 343, 359 (2003)). The word "true" in the term "true threats" is an important distinction separating the unprotected category of expression from "jests, 'hyperbole,' or other statements that when taken in context do not convey a real possibility that violence will follow." *Id.* at 74 (citing *Watts v. United States*, 394 U.S. 705, 708, (1969)). Mr. Lawmaster's "86" comments are not true threats, and they obviously do not fall into any other category of unprotected speech.

As noted above, Mr. Lawmaster understands (and understood at the time he posted) that "86" is restaurant industry slang for "get rid of." (Dkt. 22-1 at 2 ¶ 6). This understanding accords with other sources' definitions of the term. For example, Merriam-Webster traces the term to 1930s soda-counter slang meaning an item was sold out, likely because "it is rhyming slang for *nix.*" Merriam-Webster Dictionary, *Search Dictionary: What does 'eighty-six' mean?*" https://www.merriam-webster.com/wordplay/eighty-six-meaning-origin (last visited July 28, 2026). In fact, Director Spivey researched the issue after "the Comey incident" to ascertain its "exact meaning and it was his "understanding

[19]

[] it came from the restaurant industry and it had to do with removing items that were either sold out or no longer available." (Dkt. 22-2 at 38:8-12).

Mr. Lawmaster's knowledge of the meaning of "86" is why the indictment of James Comey distressed him so much: the term "86" is not a true threat of any kind and he believes the Government's indictment clearly violated the First Amendment. (Dkt. 22-1 at 2 ¶ 7). So, Mr. Lawmaster's decision to likewise post "86" and reference several politicians was not a "serious expression" conveying his intent to "commit an act of unlawful violence." *Counterman*, 538 U.S. at 359. It was protected political expression—a protest against what he believes to be fundamental rights under attack by elected officials in Washington and Indiana. (*Id.* at 2 ¶ 8).

It is well understood that "[t]he free flow of political speech 'is central to the meaning and purpose of the First Amendment.'" *Wisc. Right to Life State Pol. Action Comm. v. Barland*, 664 F.3d 139, 152 (7th Cir. 2011) (quoting *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 329 (2010)). The First Amendment's protection of robust political expression includes even "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Demonstrating this commitment, the Supreme Court has long protected political hyperbole, even when it hopes for the death of public officials (which, to be absolutely clear, Mr. Lawmaster did not do).

[20]

Consider just a few examples. In *Watts v. United States,* a Vietnam War protester was prosecuted for saying, "[i]f they ever make me carry a rifle the first man I want to get in my sights is L.B.J." 394 U.S. at 706. The Supreme Court found it clear that this statement was "political hyperbole," not a "true threat," and ordered that the protester be acquitted. *Id*. at 708. And even though language in the political arena is often "vituperative, abusive, and inexact," it does not lose its protection under the First Amendment. *Id.* Likewise, in *Rankin v. McPherson,* the Supreme Court considered the firing of a clerical employee of a Texas county constable's office. 483 U.S. 378 (1987). After learning of an assassination attempt on then-President Ronald Reagan, the employee said to others in her office: "if they go for him again, I hope they get him." *Id.* at 381. The Court held that the employee's comment was protected political speech. *Id*. at 380, 386. Mr. Lawmaster's comments on Facebook receive no less protection, and Mr. Spivey's attempts to curtail those comments violated the First Amendment. And most recently, the United States District Court in Washington, D.C., issued a permanent injunction after U.S. Park Police officers indicated to a protester that her "8647" flag in a demonstration put her "at risk of criminal prosecution." *Accountability NOW USA v. Griess*, No. CV 26-1385 (RDM), 2026 WL 1870626, at *4, *21-*23 (D.D.C. June 29, 2026).[9] The court concluded that "8647" was clearly "core protected speech." *Id.* at *2.

---

[9]     Similarly to Director's Spivey's actions, the officers in *Accountability NOW USA* asked the protester to "'please refrain from putting it back up' and warned that, '[i]f it comes back up[,] we'll be by here again, OK, and then it will be a violation of the permit.'" *Id.* at *4.

[21]

To be sure, Director Spivey has attempted to retroactively justify his behavior by recasting his admonition as only warning to Mr. Lawmaster not to say anything *worse* than "86," seeming to acknowledge that saying "86" in reference to various elected officials itself is okay. (Dkt. 22-2 at 72:24 – 74:22). This *post hoc* attempt to justify the unjustifiable is simply not credible because, of course, during their conversation Director Spivey told Mr. Lawmaster that he had "crossed the line" by making his "86" comment and warned that "we could easily indict you over this today. Alright?" (*Supra* at 9). This language makes clear that Director Spivey considered Mr. Lawmaster's speech punishable and wanted him to stop as they stood on his front porch.

Even ignoring the fact that Director Spivey is now attempting to distance himself from the position he clearly took when he spoke to Mr. Lawmaster, crediting this change of position hardly cures or excuses the violation of Mr. Lawmaster's First Amendment rights. Mr. Lawmaster has no idea where the "line" is that continues to be an omnipresent restriction on his First Amendment rights due to the penalties for crossing it. This vague but certainly continuing impingement on his rights is unconstitutional as it amounts to a prior restraint on Mr. Lawmaster's expression, "the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).

After all, what might be considered to be worse or to "go further" (Dkt. 22-2 at 79:4) is in the eye of the beholder and cannot be left up to the judgment of state officials.

[22]

*See Bantam Books*, 372 U.S. at 70; *Backpage.com*, 807 F.3d at 237. To the extent that Director Spivey is now, for example, contending that "86" is on the "right" side of the line, this merely underscores the point. There is a wide array of speech that may be considered by an official to be worse than "86 Rokita" but is nonetheless protected by the First Amendment. *See, e.g., Watts*, 394 U.S. 705. Yet, Mr. Lawmaster has been threatened that if he "crosses the line" he may be subject to prosecution. And "threats of criminal prosecution for" engaging in protected expression chills "speech that lies at the First Amendment's heart." *United States v. Alvarez*, 567 U.S. 709, 733 (2012) (cleaned up). Director Spivey's threats and warning therefore constitute an unconstitutional prior restraint. *Bantam Books*, 372 U.S. at 68-69 (the defendants' "thinly veiled threats to institute criminal proceedings against [plaintiff] if [he] do[es] not come around" were a prior restraint).

Even if Director Spivey really did intend only to prevent some "further" worse speech, and his conversation with Mr. Lawmaster certainly belies that intent, his actions still violate the First Amendment. After all, Mr. Lawmaster has been left with nothing but a threat of future adverse action if he chooses to engage in activity that is clearly protected by the First Amendment. He needs an injunction to protect his right to free expression and to spare him from adverse actions when he exercises that right.

## II.   The other factors for the grant of a preliminary injunction are met

### A.   Mr. Lawmaster is being caused irreparable harm for which there is no adequate remedy at law

[23]

The Supreme Court has stressed that the violation of the First Amendment, for even "minimal periods of time," is "unquestionably . . . irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) (citation omitted). Given this, "money damages are therefore inadequate." *Joelner v. Village of Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004) (citation omitted). "[I]njunctions are especially appropriate in the context of first amendment violations because of the inadequacy of money damages." *National People's Action v. Village of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990) (citation omitted). Mr. Lawmaster is being denied his rights under the First Amendment and this is causing him irreparable harm for which there is no adequate remedy at law.

**B.     The balance of harms and the public interest favor an injunction**

When the government is a party, the balance of equities and the public interest merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). A governmental entity cannot claim that requiring it to comply with the Constitution is harmful. As the Seventh Circuit has noted, if the government "is applying [a] policy in a manner that violates . . . First Amendment rights. . . then [the government's] claimed harm is no harm at all." *Christian Legal Society v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006). The balance of harms therefore favors issuance of equitable relief. Similarly, "injunctions protecting First Amendment freedoms are always in the public interest." *Id.* at 859 (citation omitted). These factors also favor an injunction.

**C.     Injunctive relief should issue without bond**

[24]

The issuance of a preliminary injunction will not impose any monetary injuries on the defendant., In the absence of such injuries, no bond should be required. *See. e.g., Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010) (citing authority for waiver of bond when there is no danger that a defendant will incur monetary damages as "[t]here is no reason to require a bond in such a case").

## Conclusion

It is axiomatic that "lawful political speech [is] at the core of what the First Amendment is designed to protect." *Virginia v. Black*, 538 U.S. at 365. Yet this is precisely the speech that Director Spivey's actions have targeted and chilled. Mr. Lawmaster will prevail on his claim that his First Amendment rights have been and continue to be violated. A preliminary injunction should issue to stop this ongoing harm.

Kenneth J. Falk
Gavin M. Rose
Stevie J. Pactor
Joshua T. Bleisch
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
grose@aclu-in.org
spactor@aclu-in.org
jbleisch@aclu-in.org

Attorneys for Plaintiff

[25]