**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

LEE LAWMASTER,

Plaintiff,

v.

KURT SPIVEY,

Defendant.

Case No. 1:26-cv-923-SEB-MG

**DEFENDANT'S RESPONSE IN OPPOSITION TO PRELIMINARY INJUNCTION**

Plaintiff Lee Lawmaster asks this Court to enjoin Defendant Kurt Spivey from taking "any adverse action" against him for posting "86" comments on social media that are not true threats under United States Supreme Court precedent. But there is nothing to enjoin and the very injunction he seeks requires inquiry into the speaker's mind for any threat determination. As Director of Investigations, Mr. Spivey did just that and concluded Mr. Lawmaster's "86" comments directed at Attorney General Rokita were merely political rhetoric, and closed the matter. No further action occurred. Based on a sole brief encounter, Mr. Lawmaster claims to have self-censored out of fear of retribution; however, by his own testimony, any self-censoring by Mr. Lawmaster is litigation-driven, not fear-based. This is not the "actual and well-founded fear" required to establish Article III standing based on a self-inflicted injury under the First Amendment. Therefore, Mr. Lawmaster's motion for preliminary injunction should be denied because he lacks Article III standing, as he cannot establish a well-founded injury in fact or a credible threat of enforcement, nor can he satisfy Article III's redressibility requirements, and his claim is not ripe.

Justiciability issues aside, Mr. Lawmaster is unlikely to succeed on the merits. He challenges no statute, ordinance, or policy, only a single, brief, polite conversation resulting in no state action. Mr. Spivey's word choice and tone were civil; he wielded no regulatory authority; Mr. Lawmaster's

contemporaneous conduct showed no perception of threat; and Mr. Spivey referenced no adverse consequences within his power. A government official's polite request to "tone down the rhetoric," alone is not coercion. And the First Amendment does not entitle a speaker who invited/anticipated an investigation to an injunction under the record here. Finally, the balance of equities and public interest favor denial. An injunction would impermissibly thwart inquiry and assessment into potential veiled threats against an elected official inconsistent with fact-sensitive Supreme Court true threat standards, while providing no cognizable benefit to Mr. Lawmaster, who was never prevented from speaking and has continued to engage in political commentary without consequence. For all these reasons, the Court should deny Mr. Lawmaster's motion for preliminary injunction.

## BACKGROUND

### I. The Parties

#### A. Lee M. Lawmaster

Plaintiff Lee M. Lawmaster is a tech-savvy Bloomington, Indiana resident employed as a business systems analyst for Indiana University. (Ex. 1 – Lawmaster Dep. at 4:15-20; Dkt. 22-1 – Lawmaster Decl. ¶ 1). Mr. Lawmaster frequently engages in political debates and routinely posts on social media platforms, including Facebook, Reddit, Instagram, TikTok, and his personal online blog. (*Id.* at 10:12-16, 11:15-18, 115:18-24; Dkt. 22-1 ¶¶ 2-3). On Reddit, his username is Docpepson. (Ex. 1 at 23:23-25, 24:1-2). Mr. Lawmaster's personal online blog is maintained at Lee-Lawmaster.com. (Ex. 1 at 24:10-11).

#### B. Kurt Spivey

Since April 13, 2026, Defendant Kurt Spivey has been employed as Director of Investigations within the Office of the Indiana Attorney General ("OAG"). (Dkt. 22-2 – Spivey Dep. at 4:11-12, 8:22-24). Immediately prior, he served part-time for approximately six months on Attorney General Rokita's executive protection detail. (*Id.* at 8:9-20). Mr. Spivey is also a certified police officer in Indiana

with years of law enforcement experience prior to his employment with the Attorney General's Office. (*Id.* at 16:9-25, 17:1-23). Mr. Lawmaster did not know about Mr. Spivey's background until discovery in this case. (*see, e.g.,* Dkt. 21 ¶ 21). Although he retains police powers generally through his certification, he cannot exercise them in his State capacity as Director of Investigations. *Whole Woman's Health All. v. Hill*, 377 F. Supp. 3d 924, 935 (S.D. Ind. 2019); Ind. Code §§ 4-6-2-1.1, 4-6-1-6.

**1. OAG's Investigation Division**

As Director, Mr. Spivey heads the Investigations Division of OAG. (Dkt. 22-2 at 14:2-3, 14:20-21). The Investigations Division consists of two deputy directors who report directly to Mr. Spivey, along with seven investigators and three administrative staff members. (*Id.* at 14:2-9, 14:22-25, 15:1-4). Most investigators within the Division do not have backgrounds in law enforcement, but most have participated in investigator training programs at Indiana Law Enforcement Academy. (*Id.* at 15:21-25, 16:1-8). Investigation assignments within the Division are generally triggered by receipt of constituent or citizen reports from throughout the State, or upon request by OAG staff from another division. (*Id.* at 22:25, 23:1-11). However, investigation assignments within the Division never come directly from the Attorney General. (*Id.* at 24:8-10).

The Division's investigations history includes eight threat cases against OAG staff, the Attorney General, or other more general referrals (such as school bomb threats), with only two threat cases resulting in OAG referral to outside law enforcement agencies. (*Id.* at 27:16-18, 28:2-6). After the Division refers a matter to criminal authorities, it ceases any future involvement with the matter. (*Id.* at 28:8-10). Mr. Lawmaster's social media posts were not among the two referred to outside agencies by OAG. (*Id.* at 28:25, 29:1-3). Any state criminal prosecution for threats to an elected official would occur under Indiana's intimidation statute, Indiana Code § 35-45-2-1(a)(4). The Indiana Attorney General's Office lacks authority to convene a grand jury, arrest, or prosecute intimidation

offenses. *Whole Woman's Health All. v. Hill*, 377 F. Supp. 3d 924, 935 (S.D. Ind. 2019); Ind. Code §§ 4-6-2-1.1, 4-6-1-6.

## II. The Comey Indictment and Mr. Lawmaster's Online Speech

On April 28, 2026, a federal grand jury in the Eastern District of North Carolina indicted former FBI Director James Brien Comey on two charges: (i) 18 U.S.C. § 871(a)—threat against the United States President; and (ii) 18 U.S.C. § 875(c)—transmitting a threat in interstate commerce. *United States v. Comey*, No. 4:26-cr-16-FL-RN, Dkt. 1 (E.D.N.C. Apr. 28, 2026). Both charges stemmed from a post made by Mr. Comey on his social media account depicting an image of "8647." *Comey*, No. 4:26-cr-16-FL-RN, Dkt. 1 at 1-2. The grand jury determined this post represented a knowing and willful death threat, or threat to cause bodily harm, against the 47th President of the United States, Donald Trump. *Id.* The indictment received heavy media coverage nationwide.[1] Mr. Lawmaster followed the news coverage and understood before posting on social media that the U.S. Department of Justice's ("DOJ") position was that Comey "was threatening the life of the president," and that a grand jury had indicted Comey for posting the term "8647." (Ex. 1 at 27:25-28:18; 29:2-5).

Shortly after the Comey indictment, Mr. Lawmaster began posting "86 <insert official's name>" on the Facebook pages of various state and federal officials, including: U.S. Senator Jim Banks; AG Rokita; U.S. Senator Todd Young; U.S. Representative Erin Houchin; U.S. Senator Bernie Moreno; and U.S. Representative Clay Fuller. (*Id.* at 33:15-25, 34:1-25, 35:1-4). In addition, Mr. Lawmaster posted: "86 47" on U.S. Department of Education's Facebook page; "86 Any and All Christian Nationalists" on DOJ's Facebook page; and "8647 I'll be waiting" on his friend's page. (*Id.* at 31:6-12, 36:20-23). Lawmaster described his 86 comments to a friend: "I keep commenting 86 plus name on all political pages now. It's quite fun. *Let's see what happens.*" (*Id.* at 38:5-7) (emphasis added). Mr. Lawmaster concedes that by commenting "let's see what happens", he meant, "let's see if anybody

[1] *See, e.g.,* CNN Exclusive; DOJ Press Release; ACLU's Statement; CNBC Coverage.

investigates my words..." and that one of the possibilities he contemplated was "investigators coming to [his] door." (*Id.* at 38:15-17; 41:19-24).

## III. The Constituent Report and OAG's Investigation

On or about April 30, 2026, a constituent reported Mr. Lawmaster's "86 Todd Rokita" post to a member of OAG's outreach team, who then forwarded it to OAG's Executive Protection Director, Jeremy Steward. (Dkt. 22-2 at 31:15-20). Mr. Steward then relayed the matter to Mr. Spivey by phone. (*Id.* at 34:15-17, 35:8-10). Upon receipt, Mr. Spivey and one of his Deputy Directors began investigating Mr. Lawmaster's comment to determine whether it constituted a potential threat against AG Rokita. (*Id.* at 32:4-6, 33:11-14, 39:21-25). Mr. Spivey and various staff became aware of Mr. Lawmaster's various other "86" comments on Facebook, but the investigation focused solely on Mr. Lawmaster's comments directed at AG Rokita. (Dkt. 22-2 at 32:19-22).

Mr. Spivey conducted research on the term "86" and was aware of Comey's indictment. (*Id.* at 38:7-14). He was also aware that "86" has been used by the restaurant industry for menu items that are no longer available and need to be removed. (*Id.*). However, from his law enforcement experience, Mr. Spivey knew that context matters; when a person uses "86" directed at a person, the context can change. (*Id.* at 38:19-21). Mr. Spivey's initial assessment also considered the Comey incident and other recent threats and attempts on the life of the President and the way those situations evolved. (*Id.* at 38:15-19). Mr. Spivey also assessed Mr. Lawmaster's Facebook page generally for any "danger signs." (*Id.* at 45:2-3, 45:5). Likewise, the Deputy Director began doing analytical background research into Mr. Lawmaster and compiled a Security Risk Report. (Dkt. 22-2 at 101-102). Background information contained in this Report was then relayed over the phone to Mr. Spivey prior to visiting Mr. Lawmaster, including information related to Mr. Lawmaster's violent criminal history resulting in conviction in 2016, under Cause No. 53C02-1512-F6-1192. (Dkt. 22-2 at 34:8-10, 35:17, 36:22-25,

37:8-9). At some point it was also decided that Mr. Spivey would go visit Mr. Lawmaster at his home to ask him about his "86 Todd Rokita" post. (*Id.* at 40:1-3).

### A. The Parties' Encounter

On May 1, 2026, Mr. Spivey visited Mr. Lawmaster's home to assess the risk and deescalate the situation. (Dkt. 22-2 at 45:3). Both parties recorded the encounter, and both agree that the audio and video records manually designated to the Court by Mr. Lawmaster accurately represent the parties' May 1st encounter. (Dkt. 22-2 at 13:13-16, Dkt. 24). The voluntary conversation began with Mr. Spivey identifying himself to Mr. Lawmaster as an investigator with OAG. (Ex. 1 at 42:18-20; Dkt. 22-2 at 13:17-21). Mr. Spivey also showed Mr. Lawmaster a wallet containing an I.D. card on one side and what appeared to be a typical badge on the other that said "Investigator." (Dkt. 22-2 at 20:2-5). Mr. Spivey did not present his law enforcement badge because he was not conducting a criminal investigation. (*Id.* at 19:19-23). The parties' encounter lasted approximately two minutes outside of Mr. Lawmaster's front door. (Ex. 1 at 44:20-24). Mr. Lawmaster understood that he could have declined to speak with Mr. Spivey. (*Id.* at 46:20-23).

Mr. Lawmaster agrees that his brief conversation with Mr. Spivey was polite and civil. (*Id.* at 123:15-23). Mr. Spivey did not give Mr. Lawmaster a *Miranda* warning, did not request a consent or warrant search of Mr. Lawmaster's home or person, did not tell Mr. Lawmaster that he must answer his questions, and did not enter Mr. Lawmaster's home or ask to. (*Id.* at 46:12-20). Mr. Spivey was dressed in plain clothes, not a police uniform. (*Id.* at 44:11-14). It is undisputed that Mr. Spivey did not threaten to arrest Mr. Lawmaster, did not tell him to stop posting on social media, did not tell him to delete any post—including the "86 Rokita" posts—and did not issue a citation, summons, or any other formal or informal documents. (*Id.* at 47:17-48:18). Mr. Spivey affirmed Mr. Lawmaster's rights three times during the conversation: "You have the right to freedom of speech ... You have the right to say what you want ... You have the right to have whatever opinion you want." (Dkt. 21 at 7; Pl.'s

Ex. 2 at 1:03 – 1:07). Mr. Spivey assured Mr. Lawmaster that he respected those rights. (Dkt. 21 at 7; Pl.'s Ex. 2 at 1:08). It took Mr. Spivey just over a minute to conclude that Mr. Lawmaster's "86 Rokita" posts were "political rhetoric." (Pl.'s Manually filed Ex. 2 – MP4 Video at mark 1:19).

Despite Mr. Spivey's multiple assurances, Mr. Lawmaster takes issue with his attempts to convince him to "tone down" his "political rhetoric": "You know, maybe you and I can come to an agreement that we kind of tone down the political rhetoric a little bit ... if Comey was indicted, we could easily indict you over this today ... hopefully, we don't have to come back." (Dkt. 21 at 7-8; Pl.'s Ex. 2 at 1:13 – 1:55, 2:03). The conversation ended with Mr. Spivey telling Mr. Lawmaster the matter was considered "put away" followed by a friendly farewell. (Dkt. 21 at 8-9; Pl.'s Ex. 2 at 2:07 – 2:13).

## IV. The Parties' Post-Encounter Conduct

### A. Lawmaster

According to Mr. Lawmaster, immediately after the encounter he told his then-fiancée, "You will not believe what the fuck just happened," and showed her the ring camera video. (Ex. 1 at 52:22-24). Mr. Lawmaster maintains several surveillance cameras inside his home. (*Id.* at 128:3-8). The living room camera would have at least captured the audio of this conversation with his fiancée. (*Id.* at 129:19-21; 130:13-17). However, Mr. Lawmaster failed to preserve the living room video with audio , despite: preserving the ring camera footage; his knowledge that he had a potential legal claim; and the fact that he could have taken steps to preserve the living room recording. (*Id.* at 53:20-54:1, 54:7-9, 54:13-20).

After speaking with his fiancée, Mr. Lawmaster immediately contacted two private attorneys in succession, one of whom he keeps on constant retainer. (*Id.* at 55:13-18, 56:1-3, 56:9-10). Within minutes of Mr. Spivey's visit, Mr. Lawmaster learned from these attorneys that neither Mr. Spivey nor OAG has the power to arrest or indict him. (*Id.* at 49:10-19, 134:8-11). After speaking with the two private attorneys, Mr. Lawmaster promptly sent the ring camera video of the parties' encounter to his

local news reporter friend, Jeremy Hogan, telling Mr. Hogan, "Feel free to use the video if you want for a story, just edit me out and make it [anonymous]." (*Id.* at 57:15-20; Ex. 2 at 1-2). Mr. Lawmaster then swiftly secured ACLU representation for this lawsuit minutes later. (Ex. 2 at 2).

**B. Spivey**

After leaving Mr. Lawmaster's home, Mr. Spivey had no further concerns about the matter and considered it done. (Dkt. 21 at 8-9; Dkt. 22-2 at 78:10-13; Pl.'s Ex. 2 at 2:07 – 2:13). Mr. Spivey spoke with his Deputy Director to "ease off the monitoring" of Mr. Lawmaster's public Facebook activity. (*Id.* at 78:1-3, 78:5-13). There was no further investigation by Mr. Spivey or his Division. (*Id.* at 79:9-12). The matter was never referred to law enforcement, and there is no indication it was ever referred to any prosecutors. (*Id.* at 79:15, 86:15-16). The initial investigation was closed out before it could move past any preliminary assessment stages and before media coverage of this case. (*Id.* at 60:15-18) ("It was short. We closed it out and felt there was no reason for the creation of a file").

**V. Mr. Lawmaster's Alleged Self-Censoring**

Mr. Lawmaster claims to have self-censored his online commentary due to Mr. Spivey's visit as follows: (i) ceasing his "86" comments "on the social media sites operated by elected officials and government agencies"; (ii) generally ceasing all "comments to the Facebook pages or any social media sites of public officials or agencies"; and (iii) putting his online "blog in maintenance mode" to make it nonpublic and ceasing his blogging activity. (Dkt. 22-1 ¶¶ 24-25, 27). Mr. Lawmaster concedes that within certain social groups, a reasonable person could find his "86" comments threatening. (Ex. 1 at 120:1-5).

According to Mr. Lawmaster, his self-censoring is entirely litigation-driven, not fear-driven. Mr. Lawmaster testified at his deposition that he ceased his online political commentary so that he would not contradict his own complaint:

> Q: *Help me understand why you wouldn't feel free to post on other elected officials' page 86 Merino, an Ohio politician who's not in Indiana, or similar comments?*

A: *Because doing so would show that I am not doing what I said I was doing in the filings that I am no longer -- because I fear whatever may happen.*

Q: *So the reason you're not posting 86 M[ore]no, just as an example, it would contradict what you've submitted to the court?*

A: *Exactly.*

Q: *Why would that be a bad thing?*

A: *I don't like contradicting the court of law.*

(Ex. 1 at 79:2-14); *see also* (Ex. 1 at 132:15-19, 133:10-11 ("I want to hear what the court has to say before I make any moves")). In addition, the sole reason Mr. Lawmaster took down his online blog shortly after filing this lawsuit was for litigation purposes based on an attorney-client privileged communication with his counsel in this case:

Q: *I'm asking for the reason why you personally decided to put your blog in maintenance mode.*

A: *The why involves privileged communication with counsel.*

Q: *So the reason you put it in maintenance mode is for some conversation you had with counsel?*

A: *Correct.*

Q: *Any non-privileged reason?*

A: *No.*

(*Id.* at 26:3-12).

The record also establishes that Mr. Lawmaster has not self-censored as previously claimed. Based on Mr. Lawmaster's Facebook activity logs produced in discovery and a search of his social media usernames provided at his deposition, since filing this lawsuit, he has continued to engage in online political commentary–including on the pages of government entities or officials–as follows:

**<u>Facebook</u>**

**May 7, 2026 – Lee Lawmaster shares a link to an article about the instant lawsuit by Bloomingtonian.**
(Ex. 2 at 10); *see also* Ex. 1 at 58:2-8) (Mr. Lawmaster's reporter friend, Jeremy Hogan, is Editor-in-Chief of the Bloomingtonian)).

**May 11, 2026 – Lee Lawmaster shares a link to an article about the instant lawsuit by BSquareBulletin.**
(Ex. 2 at 10).

**May 26, 2026 – Lee Lawmaster commented on Marty Hawk's (Monroe County Council) post:**

Seems like Mr. Spoonmore seems to be pushing an agenda, as he sure posted this just about everywhere ... Tries to paint the county council in a bad light if you ask me, and that's not a good look.

(Ex. 2 at 8 (cleaned up); *see also* Ex. 1 at 82:7-25, 83:7-9 (Mr. Lawmaster conceding that this post is about Monroe County Council current affairs).

**May 26, 2026 – Lee Lawmaster commented on Melanie Davis's post talking about his encounter with Mr. Spivey:**

I've learned as of late that I have a sense of self control given such situations that is rare among my circle. From a very early age I learned that letting others show their hand first often gives a positive result in the court of law. My last name isn't Lawmaster for nothing.

(Ex. 2 at 8, 19-20) (cleaned up); Ex. 1 at 86:23-25, 87:1-8).

**May 27, 2026 – Lee Lawmaster commented on Monroe County Board of Commissioners' photo:**

You know some localities have secondary jails. Build a newer but smaller one, rehab the existing one and use it for people with hearings, work release, drug rehab, etc. ... You don't have to reinvent the wheel here ... It's bad on all of us that the commissioners want to spend egregiously, and I appreciate the council for putting a check in their powers.

(Ex. 2 at 9 (cleaned up); Ex. 1 at 97:7-25, 98:1-4).

**<u>Reddit</u>**

**Screenshot captured by defense counsel on Reddit of Mr. Lawmaster's user handle "docpepson", on August 20, 2026:**


r/bloomington • Tri-North Middle School front office staff refusing to call parents when children ask.

docpepson commented 1 day ago

Devil's Advocate: You know the phrase about unjust laws, right?

Do you know what the penalties for breaking this law are? Genuine question.

Remember, punishable by a fine just means legal for a fee.

1 Reply Share ···

(Ex. 1 at 23:23-25, 24:1-2). Mr. Lawmaster concedes that since filing this case, he has been actively engaged in political online conversation about his local community and regarding State matters about this lawsuit. (Ex. 1 at 86:23-25, 87:1-8, 98:14-17).

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (internal citations omitted). To obtain this extraordinary relief, the plaintiff bears the burden of showing that he (1) "is likely to succeed on the merits," (2) will "suffer irreparable harm absent preliminary relief," (3) the balance of equities tips in his favor, and (4) "an injunction is in the public interest." *Smiley v. Jenner*, 173 F.4th 865, 870 (7th Cir. 2026). A preliminary injunction should not be issued "simply to prevent the possibility of some remote future injury." *Winter*, 555 U.S. at 22 (citations omitted).

## ARGUMENT

### I. Mr. Lawmaster failed to establish a justiciable controversy

Mr. Lawmaster's preliminary injunction request fails at the outset because he lacks standing and his claim is not ripe. "It goes without saying that those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Art. III of the Constitution by alleging an actual case or controversy." *Lopez-Aguilar v. Marion Cnty. Sheriff's Dep't*, 924 F.3d 375, 384

(7th Cir. 2019) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983)). Mr. Lawmaster must demonstrate three elements to establish standing under Article III of the United States Constitution: (1) "an injury in fact that is concrete, particularized, and actual or imminent"; (2) the defendant caused the injury; and (3) "the injury would likely be redressed by the requested judicial relief." *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1618 (2020) (citations omitted). "This triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103–04 (1998) (citations omitted). Mr. Lawmaster's request for preliminary injunctive relief must be denied because he failed to satisfy the requisite injury-in-fact and redressability elements of Article III standing.

**A. Mr. Lawmaster has no well-founded injury-in-fact**

For an injury to satisfy Article III standing, it "must be concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citations and quotations omitted). To show a sufficient injury in a pre-enforcement action under the First Amendment, Mr. Lawmaster must show either: (1) a future imminent injury from "an intention to engage in a course of conduct arguably affected by a policy, and that he faces a credible threat the policy will be enforced against him when he does"; or (2) a present injury from "a chilling effect on his speech that is objectively reasonable, and that he self-censors as a result[.]" *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020) (internal citations omitted). Under either showing, Mr. Lawmaster must also establish a credible threat of enforcement; "without one, a putative plaintiff can establish neither a realistic threat of legal sanction if he engages in the speech in question, nor an objectively good reason for refraining from speaking and 'self-censoring' instead." *Speech First, Inc.*, 968 F.3d at 639 n.1 (citing *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018)). Mr. Lawmaster advances the second path as his standing grounds, so he must establish a credible threat of

enforcement and objectively reasonable chilling of his social media speech resulting in self-censoring. *Speech First, Inc.*, 968 F.3d at 638; (Dkt. 23 at 14).

Mr. Lawmaster failed to establish a present injury and a credible threat of enforcement necessary to establish Article III standing. He may "establish standing based on a current injury if [he has] resorted to self-censorship out of an actual and well-founded fear that the law will be enforced against [him]." *Wirtshafter v. Trs. of Indiana Univ.*, 784 F. Supp. 3d 1091, 1102 (S.D. Ind. 2025) (citations and quotations omitted). Self-imposed chilling must be "objectively reasonable," not subjective. *Wirtshafter*, 784 F. Supp. 3d at 1102; *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972) ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm"). Mr. Lawmaster's fears must be "actual and well-founded." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988). Speculative or hypothetical fears that the government may misapply the law to future speech do not suffice. *Schirmer v. Nagode*, 621 F.3d 581, 588 (7th Cir. 2010).

**1. Mr. Lawmaster has not self-censored out of fear of retribution**

As an initial matter, Mr. Lawmaster has not self-censored his online political speech as claimed. Mr. Lawmaster's brief assumes the chilling component is satisfied because he stopped posting "86" comments on social media and claims to have otherwise stopped posting on the Facebook pages of public officials "out of fear of retribution," despite his desire to do so. (Dkt. 23 at 14-15; *see also* Dkt. 22-1 ¶¶ 24-25). However, Mr. Lawmaster has been deposed since the filing of his brief, and based on his sworn concessions, this is no longer a viable position. Mr. Lawmaster concedes that since filing this lawsuit, he has continued to engage in online political commentary–including on the pages of government entities or officials. (Ex. 1 at 98:14-17). He has also continued to engage in political conversation regarding State matters related to this lawsuit. (*Id.* at 86:23-25, 87:1-8). The only online speech he appears to have actually ceased is his "86" comments, but his deposition testimony makes

clear that his reasoning is not fear-based; it is litigation-based. (Ex. 1 at 79:2-14 (Mr. Lawmaster testifying that post-Spivey visit, he does not feel free to comment "86 M[ore]no" or other similar comments "[b]ecause doing so would show that I am not doing what I said I was doing in the filings that I am no longer -- because I fear whatever may happen"); *see also* Ex. 1 at 132:15-19, 133:10-11). Therefore, any self-censoring by Mr. Lawmaster is not out of fear of prosecution or other retribution, which alone demonstrates that Mr. Lawmaster has no standing for injunctive or any other relief. *Speech First, Inc.*, 968 F.3d at 638.

To be sure, the speech at issue here is speech that Mr. Lawmaster "rarely, if ever" engaged in before this episode; he does not follow politicians and rarely encounters their content at all. (Ex. 1 at 69:23-70:12). According to Mr. Lawmaster, he continues to "actively" engage in political commentary since May 1st, including criticism of elected officials on their own pages, without any fear of the prosecutor within his locality. (*Id.* at 82:7-83:22, 95:2-99:3). And he is demonstrably not a speaker of fragile sensibilities: his recent Reddit suspension for a comment flagged as inciting violence, and his recent Facebook removal of his Ted Kaczynski meme for depicting a "dangerous person," changed nothing about how he posts. (*Id.* at 18:3-19:11, 21:12-18, 23:15-17). A plaintiff whose "chill" dissolves under oath into a candid desire to support his pleadings has alleged, at most, "subjective chill," which "is not an adequate substitute for a claim of specific present objective harm." *Laird*, 408 U.S. at 13-14.

### 2. Any chilling effect on Mr. Lawmaster's speech is unreasonable

Mr. Lawmaster may "establish standing based on a current injury if [he has] resorted to self-censorship out of an actual and well-founded fear that the law will be enforced against [him]." *Wirtshafter v. Trs. of Ind. Univ.*, 784 F. Supp. 3d 1091, 1102 (S.D. Ind. 2025) (citations and quotations omitted). Self-imposed chilling must be "objectively reasonable," not subjective. *Wirtshafter*, 784 F. Supp. 3d at 1102; *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972) ("Allegations of a subjective 'chill' are not

an adequate substitute for a claim of specific present objective harm or a threat of specific future harm."). Mr. Lawmaster's fears must be "actual and well-founded." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988). Speculative or hypothetical fears of future government misapplication of challenged legal authority do not suffice. *Schirmer v. Nagode*, 621 F.3d 581, 588 (7th Cir. 2010).

To determine whether "a challenged communication is reasonably understood to be a coercive threat," judicial analysis usually entails "fact-intensive approaches utilizing a multifactor test or a totality-of-the-circumstances analysis." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 189-90 (2024). Considerations include: "(1) word choice and tone; (2) the existence of regulatory authority; (3) whether the speech was perceived as a threat; and, perhaps most importantly, (4) whether the speech refers to adverse consequences." *Vullo*, 602 U.S. at 189-90 (collecting authority); *Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015) (considering the same factors under totality-of-circumstances analysis). No single factor is dispositive. *Vullo*, 602 U.S. at 190.

This record cannot sustain a First Amendment chilling claim as a matter of law. Mr. Lawmaster's motion rests on his litigation declaration attesting that he fears retribution and "certainly would like" to comment in the future. (Dkt. 22-1 at 5 ¶¶ 24-26.) But his sworn deposition testimony contradicts his declaration on every material point: he is "[n]ot really" afraid, he stopped posting to support his litigation posture, and he would not resume posting even if assured he could do so without consequence. (Ex. 1 at 77:19-25, 79:6-12, 133:5-11). And Mr. Lawmaster's actions after the encounter confirm the absence of genuine fear; instead, his actions demonstrate he tried to insert himself into the "86" political debate and continue his protest through litigation. Mr. Lawmaster described his "86" comments to a friend: "I keep commenting 86 plus name on all political pages now. It's quite fun. Let's see what happens." (*Id.* at 38:5-7). He concedes that by commenting "let's see what happens," he meant "let's see if anybody investigates my words," and that one possibility he contemplated was "*investigators* coming to [his] door." (*Id.* at 38:15-17, 41:19-24) (emphasis added). In other words, Mr.

Lawmaster invited/anticipated the very investigation he now seeks to enjoin. (*Id.*). Immediately after Mr. Spivey's visit, Mr. Lawmaster contacted his constantly retained private attorney and gave the ring camera video to a local reporter to publicize the encounter. (*Id.* at 57:15-20; Ex. 2 at 1-2). He then allowed video evidence of his immediate reaction to the encounter to be destroyed while ensuring the ring camera footage he perceived as helpful to his claims was preserved. (Ex. 1 at 53:20-54:1, 54:13-20, 55:13-18, 56:1-3, 56:9-10). This is not the conduct of someone afraid; it is the conduct of someone building a lawsuit.

Even if Mr. Lawmaster were subjectively afraid of prosecution, that fear would be ill-founded and based on a remote hypothetical. Mr. Lawmaster's alleged fears are really fears that Mr. Spivey will deem his "86" comments as true threats in the future, which would first need to occur before Mr. Lawmaster's other purported fears could be realized. Any future prosecution would require (1) Mr. Lawmaster to post something new; (2) Mr. Spivey to catch wind of it and open a new investigation; (3) a decision to refer it; and (4) a non-party prosecutor–whom Lawmaster affirmatively does not fear–to exercise his or her prosecutorial discretion to charge. (Ex. 1 at 78:10-18, 98:18-99:3). A theory of standing that "relies on a highly attenuated chain of possibilities" like this "does not satisfy the requirement that threatened injury must be certainly impending." *Clapper*, 568 U.S. at 410. The Seventh Circuit rejected a nearly identical theory in *Speech First*: There, the challenged official could at most refer a matter to authorities with independent charging discretion, "[t]he mere possibility of a referral does not demonstrate standing." *Speech First, Inc.*, 968 F.3d at 643. And because any charging decision would belong to a nonparty prosecutor, the injury Mr. Lawmaster professes to fear is an "injury that results from the independent action of some third party not before the court," one the Court "cannot redress." *Murthy*, 603 U.S. at 57 (citation omitted).

Lawmaster's pre-enforcement authorities do not bridge the gap. *Babbitt v. United Farm Workers National Union*, 442 U.S. 289 (1979), *Steffel v. Thompson*, 415 U.S. 452 (1974), and *American Civil Liberties*

*Union v. Alvarez*, 679 F.3d 583 (7th Cir. 2012), each involved a challenge to a statute or policy whose enforcement credibly loomed over the plaintiff's intended speech. (Dkt. 23 at 16-17). Lawmaster challenges no statute, no ordinance, and no policy—only a single, brief, polite conversation. Plainly, there is nothing to enjoin, as demonstrated by Mr. Lawmaster's own case law reliance. (*Id.* at 15-16).

For example, in *Backpage v. Dart*, a county sheriff was enjoined from harassing business affiliates of an online ad company in an effort to demand that they disaffiliate under threat of prosecution. *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230-31 (7th Cir. 2015). The sheriff (and former prosecutor) waived his police powers and sent letters on official letterhead to credit card companies demanding that they "cease and desist from allowing [their] credit cards to be used to place ads on websites like Backpage.com." *Backpage.com*, 807 F.3d at 230-31. The sheriff sought to prevent use of the ad company for illegal human trafficking-related purposes by cutting off their financial ability to operate, resulting in an injunction enjoining the sheriff and his office from taking any "actions, formal or informal, to coerce or threaten credit card companies, processors, financial institutions, or other third parties with sanctions intended to ban credit card or other financial services from being provided to Backpage.com." *Backpage.com*, 807 F.3d at 239.

Likewise, in *Bantam Books, Inc.*, a Rhode Island Commission statutorily tasked with flagging and referring obscenity for enforcement under a newly enacted framework sent over 35 notices to book publishers warning that certain publications were deemed objectionable, and reminding them of the Commission's obligations to refer those selling the objectionable materials for criminal prosecution. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 61-62 (1963). The notices were "phrased virtually as orders, reasonably understood to be such by the distributor, invariably followed up by police visitations[.]" *Bantam Books, Inc.*, 372 U.S. at 68. The notices also typically informed publishers that a list of their "objectionable" publications were "circulated to local police departments[.]" *Id.* at 62-63. Following noncompliance by book publishers, the Commission escalated the matter to police

and the state Attorney General's Office pursuant to state law. *Bantam Book*, 372 U.S. 58, 63 at n. 5 (1963). The Supreme Court affirmed an injunction against the Commission upon finding its "blacklists" were "instruments of regulation independent of the laws against obscenity," and amounted to unconstitutional government coercion. *Id.* at 68. The circumstances in *Backpage* and *Bantam Books* are nothing like the non-action here.

Instead, *Pidanick v. LaRosa* is squarely on point. There, law enforcement officers visited the plaintiff's home and questioned her about Facebook posts she made concerning a judge, and compiled a risk assessment report; no arrest or charge followed. *Pidanick v. LaRosa*, 2019 WL 10894089, at *3-*8 (D.S.C. Mar. 15, 2019). The officer also asked Plaintiff to watch posting certain buzz words that were flagged. *Pidanick,* 2019 WL 10894089 at *3. The court held the risk assessment and home visit inquiry could not support a First Amendment claim because a visit and questioning by investigators responding to a complaint about online statements is not the kind of government action that would deter a person of ordinary firmness from continuing to speak. *Pidanick*, 2019 WL 10894089, at *8. "Thus, it was objectively reasonable for Defendants to interview Plaintiff to determine her intentions behind the postings." *Id.* The same logic applies here, with added force. Unlike the officers in *Pidanick*, as Mr. Spivey lacked the power to arrest in his Director capacity. If a police inquiry into online speech does not establish an actionable chill, Mr. Spivey's short inquiry certainly does not.

**3. Mr. Spivey's visit did not create a credible threat of enforcement**

As an initial matter, Mr. Lawmaster's brief asks this Court to find a credible threat of enforcement unnecessary if there is objectively reasonable chilling of speech. (Dkt. 23 at 17). But that is not the standard. A necessary element to show injury-in-fact for standing purposes in a First Amendment case requires the plaintiff show "a credible threat of enforcement against him" *McDonald v. Trs. of Indiana Univ.*, --- F.4th ----, 2026 WL 2349271, at *6 (7th Cir. Aug. 13, 2026). Therefore, the

Court should decline Mr. Lawmaster's invitation to analyze his motion under an incorrect legal standard.

Mr. Lawmaster argues there is a credible threat that Mr. Spivey could arrest him or refer his social media posts to a prosecutor. (Dkt. 23 at 17). For his alleged fear of future prosecution to be "credible," Mr. Lawmaster "must demonstrate that [his] fear is both actual and reasonable." *Brown v. Kemp*, 86 F.4th 745, 761 (7th Cir. 2023) (citations omitted). There is no actual or reasonable basis for fear of imminent future action by Mr. Spivey or OAG. Mr. Spivey informed Mr. Lawmaster that he was in no danger of reprisal, telling him the matter was "put away" and referring to his "86" comments as "political rhetoric" during their conversation. (Dkt. 21 at 8-9; Pl.'s Ex. 2 at 2:07 – 2:13). After leaving Mr. Lawmaster's home, Mr. Spivey had no further concerns about the matter and considered it concluded. (Dkt. 22-2 at 78:10-13). Mr. Spivey also spoke with his Deputy Director to "ease off the monitoring" of Mr. Lawmaster's public Facebook activity. (*Id.* at 78:1-3, 78:5-13). There was no further investigation by Mr. Spivey or his Division. (*Id.* at 79:9-12). The matter was never referred to law enforcement, and there is no indication it was ever referred to any prosecutors. (*Id.* at 79:15, 86:15-16). Mr. Spivey's initial investigation was closed out before it could move past any preliminary assessment stages. (*Id.* at 60:15-18) ("It was short. We closed it out and felt there was no reason for the creation of a file"). Mr. Lawmaster's "86" comments directed at Attorney General Todd Rokita have never been found to be threatening or warranting of any further action. The complete absence of any past restriction on Mr. Lawmaster's speech strongly suggests he will face none in the future. *Murthy v. Missouri*, 603 U.S. 43, 59 (2024).

But rather than guesswork, Mr. Lawmaster must show that Mr. Spivey "will likely react in predictable ways" to any future "86" comments. *Murthy*, 603 U.S. at 57–58 (citations omitted). The only predictable tendency Mr. Lawmaster could reasonably fear from future online "86" posts is that he could be subject to another voluntary and brief assessment by Mr. Spivey, which is not something

he can enjoin under the First Amendment. *Hartman v. Moore*, 547 U.S. 250, 262 n.9 (2006) ("No one here claims that simply conducting a retaliatory investigation with a view to promote a prosecution is a constitutional tort."). The First Amendment does not safeguard a right to be free from future voluntary questioning. *Hartman*, 547 U.S. at 262 n.9; *see also J.T.H. v. Mo. Dep't of Soc. Servs. Children's Div.*, 39 F.4th 489, 493 (8th Cir. 2022) (noting courts across the country "have never recognized a retaliatory-investigation" claim under the First Amendment, even though retaliation is safeguarded in other First Amendment contexts); *Archer v. Chisholm*, 870 F.3d 603, 620 (7th Cir. 2017) (citing *Hartman*, 547 U.S. at 262 n. 9). Thus, there is no substantial risk that Mr. Lawmaster will suffer an injury in the near future for his online political rhetoric, traceable to Mr. Spivey. *Murthy*, 603 U.S. at 49-50 ("To establish standing, the plaintiffs must demonstrate a substantial risk that, in the near future, they will suffer an injury that is traceable to a Government defendant and redressable by the injunction they seek.").

Mr. Lawmaster also attempts to leverage Mr. Spivey's law enforcement background and general Indiana police certification to support his fears of arrest. (Dkt. 23 at 17). But he cites no authority holding that possessing police powers alone suffices. (*Id.* at 17-18). And Mr. Lawmaster did not know about Mr. Spivey's law enforcement background until discovery in this lawsuit; Mr. Spivey never identified himself as law enforcement. (Ex. 1 at 42:18-20; Dkt. 22-2 at 13:17-21). Further, the Seventh Circuit has rejected standing even where a plaintiff was wrongfully arrested in the past, holding that the plaintiff must still demonstrate a reasonable possibility of the same arrest in the future. *Schirmer v. Nagode*, 621 F.3d 581, 583 (7th Cir. 2010). Mr. Lawmaster has never been arrested, never been charged, and never been threatened with either.

Although Mr. Spivey maintains his police certification in Indiana, he cannot exercise those powers in his capacity as OAG's Director of Investigations. "[T]he general rule in Indiana is that the Attorney General cannot initiate prosecutions[.]" *Doe v. Holcomb*, 883 F.3d 971, 977 (7th Cir. 2018);

Ind. Code § 4-6-1-6. As this Court has previously found, the Indiana Attorney General's Office has limited statutory authority "with criminal enforcement at every stage *after* the initial charges are laid." *Whole Woman's Health All. v. Hill*, 377 F. Supp. 3d 924, 936 (S.D. Ind. 2019) (emphasis added). At the start of the parties' May 1 encounter, Mr. Spivey introduced himself as "an investigator with the Attorney General's office." (Dkt. 21 ¶ 28). In that capacity, Mr. Spivey lacks authority to arrest or initiate criminal prosecution, nor was he acting under any statutory or regulatory framework requiring threat determinations and formal referral. Future arrest or prosecution traceable to Mr. Spivey is thus a legal impossibility—a fact Mr. Lawmaster's private attorneys confirmed within minutes of Mr. Spivey's departure. (Ex. 1 at 49:10-19, 134:8-11); *Doe*, 883 F.3d at 977.

Significantly, Mr. Spivey has disavowed any intent to arrest or take any other future action against Mr. Lawmaster for his "86 Rokita" posts. (Dkt. 22-2 at 60:19-24). *Blum v. Holder*, 744 F.3d 790, 798 (1st Cir. 2014) ("Particular weight must be given to the Government disavowal of any intention to prosecute on the basis of the Government's own interpretation..."). Also telling, Mr. Spivey was aware that after publicity of this case, there was an increase of "86" comments on Facebook by various individuals, but he concluded it was non-threatening rhetoric in support of Mr. Lawmaster and took no action. (Dkt. 22-2 at 55:10-15) (Mr. Spivey testifying, "those uses of it were not threatening toward the AG, it was more in support of Lawmaster after the publicity"). Therefore, Mr. Lawmaster's generalized fears of future arrest or prosecution are not credible and are not imminent concrete injuries. Consequently, there is no imminent future threat justifying an injunction. *SBA List*, 573 U.S. at 158; *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) ("The 'threatened injury must be certainly impending to constitute injury in fact'") (collecting authority).

**B. Mr. Lawmaster cannot satisfy Article III's redressability requirement**

Mr. Lawmaster's allegations claim only past harm, which cannot be redressed by an injunction. Redressability requires Mr. Lawmaster to show that his claimed injuries are "likely to be redressed by

a favorable decision." *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 38 (1976). "Injunctive relief is distinct in that, unlike damages, 'a past injury alone is insufficient to establish standing for purposes of prospective injunctive relief.'" *Duffy v. Lewis Bros. Bakeries, Inc.*, 760 F. Supp. 3d 704, 716 (S.D. Ind. 2024) (quoting *Simic v. City of Chi.*, 851 F.3d 734, 738 (7th Cir. 2017)). As detailed above, Mr. Lawmaster does not have a well-founded fear sufficient to show present or likely near-future concrete injuries.

Mr. Lawmaster's ongoing-harm theories are contingent upon Mr. Spivey's changing his mind in the future and finding "86 Todd Rokita" to be a threat of harm, referring the matter to law enforcement, and a prosecutor deciding to file intimidation charges. This speculative chain of hypothetical events is insufficient to show ongoing harm. *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects."). The lack of redressability is shown by Mr. Lawmaster's sought injunction. He seeks a preliminary injunction "enjoining Mr. Spivey from taking any adverse action against Mr. Lawmaster because of his past social media posts using '86' or any future posts using '86' or using any language that does not amount to a true threat as defined by the United States Supreme Court." (Dkt. 21 at 11). In other words, Mr. Lawmaster asks this Court to enjoin Mr. Spivey and OAG from misapplying First Amendment true-threat analysis to his "86" comments in an overly broad manner, which has not occurred, there is no indication it could occur in the imminent future, and which is not a proper basis for Article III standing or extraordinary injunctive relief. *Schirmer v. Nagode*, 621 F.3d 581, 583 (7th Cir. 2010). Whether Mr. Lawmaster suffered past First Amendment harm based on the parties' May 1st encounter will be determined through litigation of his damages claim and Mr. Spivey's qualified immunity defense. Mr. Lawmaster cannot satisfy Article III's redressability requirement for his requested injunction.

### C. Mr. Lawmaster's claim is not ripe

"Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements[.]'" *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (citations omitted). The ripeness doctrine is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 807–08. An injunctive remedy is discretionary and will not be granted unless the controversy is ripe for judicial resolution. *Alcan Aluminium Ltd. v. Dep't of Revenue*, 724 F.2d 1294, 1299 (7th Cir. 1984). "Ripeness becomes an issue when a case is anchored in future events that may not occur as anticipated, or occur at all." *Anders ex rel. Anders v. Fort Wayne Cmty. Sch.*, 124 F. Supp. 2d 618, 630 (N.D. Ind. 2000) (citing *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 200–01 (1983)).

Mr. Lawmaster's request for prospective relief is not ripe. His claimed injury depends on a series of future contingencies—new posts, a hypothetical referral that has not occurred with no indication it may occur in the future, and a charging decision by a nonparty prosecutor whom Mr. Lawmaster does not fear—that "may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation omitted). Mr. Spivey deemed the "86" comments political rhetoric, told Lawmaster the matter was "put away," and testified that nothing further would occur absent some concerning additional factor. (Dkt. 22-2 at 75:19-20, 79:8-12). A dispute contingent on events that the record shows are unlikely ever to occur is not ripe for judicial resolution or emergency equitable relief.

## II. Mr. Lawmaster cannot satisfy the requirements for extraordinary preliminary injunctive relief

### A. Mr. Lawmaster has not demonstrated a likelihood of success on the merits

Even assuming Mr. Lawmaster could establish standing, he is unlikely to succeed on the merits. He challenges no statute, no ordinance, no regulation, and no written policy—so no facial or

overbreadth challenge lies. He identifies no enactment whose enforcement is threatened—and no defendant with authority to enforce anything—so no pre-enforcement challenge lies. He alleges no adverse action—no arrest, no charge, no citation, no sanction—so he has no retaliation claim: "simply conducting a retaliatory investigation with a view to promote a prosecution" is not "a constitutional tort." *Hartman v. Moore*, 547 U.S. 250, 262 n.9 (2006). All that remains is the argument that Mr. Spivey chilled his speech through unconstitutional coercion.

The Government may express its views and attempt to persuade citizens; what it may not do is use "coercive threats aimed at punishing or suppressing disfavored speech." *NRA v. Vullo*, 602 U.S. 175, 180, 188-89 (2024). Distinguishing permissible persuasion from impermissible coercion requires a totality-of-the-circumstances inquiry guided by four factors: "(1) word choice and tone; (2) the existence of regulatory authority; (3) whether the speech was perceived as a threat; and, perhaps most importantly, (4) whether the speech refers to adverse consequences." *Id.* at 189-91; *see Bantam Books*, 372 U.S. at 66-68. As the Second Circuit put it in a decision *Vullo* cited with approval, "[w]hat matters is the distinction between attempts to convince and attempts to coerce." *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003). Here, every *Vullo* factor favors Mr. Spivey.

*Word choice and tone*: Mr. Lawmaster himself describes the conversation as "relatively calm," "polite," and "civil." (Ex. 1 at 123:12-23). Mr. Spivey affirmed Mr. Lawmaster's free-speech rights three separate times, told him to "post your stuff, do your thing, express your opinion," and labeled his posts "political rhetoric." (Dkt. 22-2 at 98). *Regulatory authority*: Mr. Spivey has none over Mr. Lawmaster. He cannot arrest him through OAG, cannot charge him, cannot indict him, and cannot regulate his speech—facts Mr. Lawmaster's own lawyers confirmed within minutes of the encounter. (Dkt. 22-2 at 20:21-25, 21:11-24; Ex. 1 at 134:5-135:9). *Perception*: Lawmaster's contemporaneous conduct betrays no perception of a threat. His immediate reaction was not to delete his posts or go quiet but to send the video to a reporter friend, contact the ACLU, and continue commenting on

political matters. (Ex. 1 at 57:15-59:25, 64:8-17, 82:7-83:22). *Adverse consequences*: Mr. Spivey referenced none within his power. He issued no citation, made no referral, initiated no proceeding, deployed no institutional machinery—no letterhead, no notices, no commission, no follow-up visit—and closed the matter on the spot. (Ex. 1 at 47:17-48:18; Dkt. 22-2 at 60:14-18, 79:8-23). In short, this was a conversation, not a coercion.

Mr. Lawmaster's claim rests on two sentences plucked from the two-minute exchange: that he had "crossed the line with a threat like that," and that "if Comey was indicted, we could easily indict you over this today." (Dkt. 21 at 7-9). Context defeats both. The only speech Mr. Spivey associated with "issues and problems" was speech "that could be perceived as a threat" (Dkt. 22-2 at 72:13-18)—that is, a true threat, which the First Amendment does not protect. *Virginia v. Black*, 538 U.S. 343, 359-60 (2003). Accurately observing that threatening speech can carry legal consequences is information, not intimidation. And the "we" in "we could easily indict you" referred to "[s]tate law enforcement as a whole" (Dkt. 22-2 at 72:20-23)—a statement immediately surrounded by Mr. Spivey's assurances that "we're not doing anything with this. This is put to bed. This is put to rest." (*Id.* at 73:3-7). A government official's request that a speaker "tone down the rhetoric," unaccompanied by any sanction or threatened proceeding, is at most a permissible appeal—"a request ... without sanctions" that constitutes persuasion, not coercion. *Hammerhead Enters., Inc. v. Brezenoff*, 707 F.2d 33, 38-39 (2d Cir. 1983); *Okwedy*, 333 F.3d at 344.

Nor does the exchange Mr. Lawmaster casts as a quid pro quo, transform the conversation into coercion. (Dkt. 22-2 at 98). A conditional offer coerces only if the official controls the consequence held in reserve. That was the vice in *Vullo*, where the superintendent allegedly offered leniency on infractions she had the power to pursue against entities she regulated, in exchange for suppressing disfavored speech. *Vullo*, 602 U.S. at 190-92. Mr. Spivey held no such leverage: there was no pending charge to drop, no regulatory proceeding to forbear from, and no enforcement action he

had the power to bring or forgo. "Letting this one slide" described the closing of a threat assessment that Mr. Spivey could not himself have escalated in any event. And no "box" was ever checked: no file was opened, no list was maintained, and the only writing generated was Spivey's own brief statement memorializing the closed matter. (Spivey Dep. 60:14-18; 86:22-87:16). That stands in stark contrast to the institutional machinery that made the "agreements" extracted in *Bantam Books* coercive. 372 U.S. at 61-63. The only alleged condition Mr. Spivey articulated, moreover, attached to speech "that could be perceived as a threat" (Dkt. 22-2 at 98)—a category the First Amendment does not protect and the State may lawfully assess. *Black*, 538 U.S. at 359-60.

Lawmaster's alternative theory, that the undefined "line" Mr. Spivey referenced operates as a vague and continuing prior restraint, misunderstands the doctrine. A prior restraint is an "administrative [or] judicial order[] forbidding certain communications when . . . issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (citation omitted). A two-minute oral conversation that imposed no legal obligation, was embodied in no order, and carried no sanction for noncompliance forbids nothing: there is no license to seek, no directive to obey, and nothing to violate. Nor did Mr. Spivey draw any "line" of his own. The line he referenced, speech "that could be perceived as a threat" (Dkt. 22-2 at 98), is the line the law itself draws between protected political hyperbole and unprotected true threats. *Counterman v. Colorado*, 600 U.S. 66, 74 (2023). That line binds Lawmaster and everyone else whether or not Mr. Spivey ever knocked on his door, and an official's accurate reference to it restrains nothing.

The coercion cases Mr. Lawmaster invokes only underscore how far removed this record is from a constitutional violation. *Bantam Books* involved a state commission armed with a statutory mandate that blanketed a distributor with thirty-five notices invoking the commission's duty to recommend prosecution, circulated blacklists to police, and dispatched officers for follow-up visits—"a scheme of state censorship" in everything but name. *Bantam Books*, 372 U.S. at 61-64, 66-68. *Vullo*

involved a state superintendent with "direct regulatory and enforcement authority" over the entities she pressured, who allegedly offered leniency on unrelated infractions in exchange for blacklisting the NRA, followed by formal guidance letters and consent decrees extracting multimillion-dollar penalties. *Vullo*, 602 U.S. at 182-84, 190-92. *Backpage* involved a sheriff with full police powers sending cease-and-desist demands on official letterhead to credit card companies, invoking a federal money-laundering statute and requesting compliance contacts—an unmistakable "threat[] ... backed by the 'power of the State.'" *Backpage.com, LLC v. Dart*, 807 F.3d 229, 230-32 (7th Cir. 2015). *Speech First* involved a standing university disciplinary apparatus and a permanent response team that logged and tracked student speech under written policies. *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1121-24 (11th Cir. 2022). And *Okwedy* involved a borough president's formal letter on official letterhead reminding a billboard company that it had "substantial economic interests" within his borough. *Okwedy*, 333 F.3d at 341-44. What happened here bears no resemblance: a single, two-minute, voluntary front-door conversation in which an investigator without charging power affirmed the speaker's rights three times, asked him to moderate his tone, told him the matter was closed, and never returned.

Mr. Lawmaster's reliance on *Accountability NOW USA v. Griess*, 2026 WL 1870626 (D.D.C. June 29, 2026) is no closer. There, U.S. Park Police officers asked a demonstrator take down her "8647" flag and "refrain from putting it back up," and warned that "if it comes back up[,] we'll be by here again . . . and then it will be a violation of the permit." *Id.* at *4. The officers there wielded ongoing enforcement authority over the demonstration permit, forbade specific protected expression outright, and promised return visits to police compliance. Mr. Spivey did the opposite: he told Lawmaster to "post your stuff, do your thing, express your opinion," attached his caution only to speech "that could be perceived as a threat," and declared the matter "put away." (Dkt. 22-2 at 98.)

Finally, the visit itself was constitutionally unobjectionable. The State has a significant interest in "protecting individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur." *Black*, 538 U.S. at 360 (citation omitted). Whether a statement is a true threat "turn[s] on" context, *id.* at 367, and assessing context requires inquiry—precisely what a threat assessment does. *See Counterman v. Colorado*, 600 U.S. 66, 69, 73-75 (2023). Nor is there anything to Mr. Lawmaster's charge that Mr. Spivey conducted no "actual investigation." (Dkt. 23 at 15). The record shows the standard steps of a threat assessment: the Office compiled an analytical report, reviewed Lawmaster's public Facebook activity for danger signs, checked his criminal history, and interviewed him. (Dkt. 22-2 at 33:10-22, 36:19-37:9, 45:2-12; 85:17-86:16). Days after a federal indictment premised on "8647," a constituent reported the same construction posted twice to the Attorney General's own page. Investigating that report, concluding it was protected political rhetoric, and closing the file is exactly how the system is supposed to work. The First Amendment does not entitle a speaker who invited an investigation ("let's see if anybody investigates my words") to an injunction because Mr. Spivey briefly, calmly, and politely obliged.

**B. There is no irreparable harm in the absence of an injunction on this record**

Mr. Lawmaster cannot demonstrate irreparable harm because his First Amendment claim fails as a matter of law. The presumption of irreparable harm in First Amendment cases is derivative of the merits: "[t]he loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages are not adequate," so where the underlying claim is unlikely to succeed, the presumption does not attach. *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006). Because Mr. Lawmaster cannot show a likelihood of success, he cannot invoke the presumption of irreparable harm.

The record independently forecloses a finding of irreparable harm. Mr. Lawmaster admits he has suffered no physical injury (Ex. 1 at 120:6-8), no financial losses (*Id.* at 121:15-17), no lost

employment or income (*Id.* at 121:18-21), and has sought no therapy, counseling, or medication (*Id.* at 120:14-22; 121:12-14). His claimed harms reduce to a generalized sense of "wondering and worrying" and the assertion that his rights were "squashed." (*Id.* at 114:9-16). But his own testimony establishes that his self-restraint is driven by litigation strategy, not fear of government action. (*Id.* at 79:6-12; 133:5-11). An injury that a plaintiff voluntarily maintains to preserve the posture of his lawsuit is not irreparable harm—it is not even harm fairly traceable to the defendant. *Clapper*, 568 U.S. at 416.

**C. Equitable considerations weigh against injunctive relief**

Even if Mr. Lawmaster could clear the threshold requirements—and he cannot—the balance of equities and public interest would independently require denial. An injunction of the scope Mr. Lawmaster seeks would hobble the Attorney General's Office in performing a core public-safety function: assessing reported threats against elected officials. The State's interest in "protecting individuals from the fear of violence ... and from the possibility that the threatened violence will occur" is substantial, *Black*, 538 U.S. at 360, and it is at its apex in the current environment of escalating threats against public officials. The Office has fielded eight threat investigations in two years, referring three for prosecution. (Dkt. 22-2 at 27:14-28:6). The government cannot be enjoined from doing its job because one citizen who invited an investigation found the response inconvenient.

On the other side of the ledger sits no cognizable hardship. Mr. Lawmaster was never prevented from speaking. He was asked once, politely, in a two-minute conversation to moderate his tone; his rights were affirmed three times; the matter was closed on the spot; and he has continued to engage in political speech ever since without consequence. The public interest is not served by enjoining the government from civilly inquiring about speech that mirrors the basis of a then-days-old federal indictment. It is served by allowing trained investigators to assess potential threats and distinguish political rhetoric from genuine danger—which is precisely what Mr. Spivey did here.

## CONCLUSION

Based on the foregoing, Mr. Spivey respectfully requests that the Court deny Mr. Lawmaster's motion for preliminary injunction.

Respectfully submitted,

Theodore E. Rokita,
Indiana Attorney General
Attorney No. 18857-49

Date: September 1, 2026

By: Adrienne N. Pope, No. 31911-49
Katherine A. Meltzer, No. 37932-49
Timothy Hamilton, No. 39708-22
Deputy Attorneys General
OFFICE OF ATTORNEY GENERAL TODD ROKITA
302 West Washington Street
Indiana Government Center South, Fifth Floor
Indianapolis, IN 46204-2770
Phone: (317) 233-0878
Fax: (317) 232-7979
Email: Adrienne.Pope@atg.in.gov
Katherine.Meltzer@atg.in.gov
Timothy.Hamilton@atg.in.gov

Andrew Nussbaum
James Compton
FIRST & FOURTEENTH PLLC
2 N Cascade Ave
Suite 1430
Colorado Springs, CO 80903
719-428-4937
Email: andrew@first-fourteenth.com
james@first-fourteenth.com

*Attorneys for Defendant*