UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LEE LAWMASTER, Plaintiff, | ) | |
| v. | ) | No. 1:26-cv-00923-SEB-MG |
| KURT SPIVEY in his individual and official capacities, Defendant. | ) | |

**ORDER DENYING DEFENDANT'S MOTION TO DISMISS AND GRANTING PLAINTFF'S MOTION FOR PRELIMINARY INJUNCTION**

On April 29, 2026, following the federal indictment of former FBI Director James Comey based on allegations relating to his social media post depicting the numbers "8647," Plaintiff Lee Lawmaster ("Mr. Lawmaster"), in an apparent gesture of political solidarity, commented "86 Todd Rokita" on the Indiana Attorney General's official Facebook page. Two days later, on May 1, 2026, Defendant Director of Investigations for the Indiana Attorney General's Office Kurt Spivey ("Director Spivey") made an in-person visit to Mr. Lawmaster's home in Bloomington, Indiana, to investigate Mr. Lawmaster's internet activity and (the perceived) threats against the Indiana Attorney General. A two-minute encounter ensued between the parties, which, albeit brief, precipitated this lawsuit.

Now before the Court is Mr. Lawmaster's Motion for Preliminary Injunction [Dkt. 10], pursuant to Federal Rule of Civil Procedure 65. Specifically, Mr. Lawmaster seeks preliminary relief enjoining Director Spivey from taking adverse action with regard to Mr. Lawmaster's past and/or future social media posts containing the phrase "86" as well as any expression that does not amount to a "true threat," as that term is defined by the Supreme Court.

Also before the Court is Director Spivey's Motion to Dismiss the Amended Complaint [Dkt. 29], pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Director Spivey challenges the adequacy of the Amended Complaint in establishing the existence of our subject matter jurisdiction as well as in pleading a plausible claim for relief.

We begin our analysis with a consideration of Director Spivey's pleading challenges under Rules 12(b)(1) and 12(b)(6) before turning to Mr. Lawmaster's request for a preliminary injunction under Rule 65. For the reasons stated below, we **DENY** Director Spivey's Motion to Dismiss and **GRANT** Mr. Lawmaster's Motion for Preliminary Injunction.

## BACKGROUND

### I. Factual Background

The following factual summary derives from the Amended Complaint. Additional facts and evidence adduced by the parties and set forth in their respective preliminary injunction submissions are discussed in the context of Mr. Lawmaster's Motion for Preliminary Injunction.

#### A. The Parties

Mr. Lawmaster is a resident of Bloomington, Indiana, who frequently visits and utilizes social media platforms, like Facebook, as a "communicative tool[ ]." Am. Compl. ¶ 14, dkt. 21. In the past, Mr. Lawmaster has viewed and commented on public officials' Facebook posts and hopes to be able to continue to do so. *Id.*

Director Spivey serves as the Director of Investigations for the Indiana Attorney General. *Id.* ¶ 8. Director Spivey possesses an extensive vocational background in law enforcement, including authorization to effect arrests under Indiana law. *Id.* ¶ 21.

### B. The Comey Indictment

On April 28, 2026, a federal grand jury indicted former FBI Director James Comey on charges of making threats against the President. *United States v. Comey*, No. 4:26-cr-00016, dkt. 1 (E.D.N.C. filed on April 28, 2026).[1] This widely publicized and controversial indictment arose from Director Comey's internet activity—namely, his alleged posting of a photograph of seashells depicting the phrase "8647." Am. Compl. ¶¶ 1, 9, dkt. 21.

### C. Mr. Lawmaster's Online Activity

On April 29, 2026, Mr. Lawmaster turned to social media to protest Director Comey's indictment, to express his displeasure with certain elected officials and their policy agendas, and to exercise his right to free expression. *Id.* ¶¶ 1, 12. Specifically, Mr. Lawmaster began commenting "86 [name]" on the official Facebook pages of various Indiana elected officials, including Attorney General Todd Rokita, Lieutenant Governor Micah Beckwith, and Senator Jim Banks. *Id.* ¶¶ 15–16. At issue in this case is Mr. Lawmaster's "86 Todd Rokita" comment, which he posted to the Attorney General's official Facebook page. *Id.* ¶ 18. No additional comments were made by Mr. Lawmaster at the time, though he allegedly has commented on the Attorney General's Facebook page in the past. *Id.*

According to the Amended Complaint, the term "86" is slang originating from 1930s-era soda counters that means "to throw out," "to get rid of," or "to refuse service to." *Id.* ¶ 10. In the context of Mr. Lawmaster's Facebook posts, his "86" comments were intended to serve two purposes: The first was to communicate his opposition to the various policies held and actions taken by Indiana's elected officials; the second was to express his solidarity with Director Comey, who

[1] We properly take judicial notice of the federal proceedings against Director Comey, which remain pending as of the date of this order. *Tobey v. Chibucos*, 890 F.3d 634, 647 (7th Cir. 2018).

Mr. Lawmaster believes to have been unfairly prosecuted for exercising his First Amendment right to the freedom of speech. *Id.* ¶¶ 12–13, 15.

**D. Director Spivey and Mr. Lawmaster's May 1st Encounter**

Somehow, the Attorney General's Office became aware of Mr. Lawmaster's "86" comment, though the Amended Complaint does not reveal when or by whom. *Id.* ¶ 19. The Attorney General's Executive Protection Director relayed the information to Director Spivey, who decided that he would visit Mr. Lawmaster personally in order to assess whether Mr. Lawmaster had made a "true threat" against the Attorney General. *Id.* ¶¶ 20, 24. Director Spivey's immediate supervisor, who reports directly to the Attorney General, was aware of the situation. *Id.* ¶ 22.

On May 1, 2026, Director Spivey travelled to Bloomington, Indiana, and visited Mr. Lawmaster at his home. *Id.* ¶ 25. At the time, Director Spivey was allegedly unaware that Mr. Lawmaster had made additional "86" comments on other Indiana officials' Facebook pages, though Director Spivey had reviewed Mr. Lawmaster's personal Facebook profile and understood that Mr. Lawmaster routinely engaged in political rhetoric and speech. *Id.* ¶ 23.

Director Spivey arrived at Mr. Lawmaster's home and knocked on the door, after which Mr. Lawmaster answered and stepped outside onto his front porch. *Id.* ¶ 28. At the outset of their interaction, Director Spivey introduced himself as an investigator with the Attorney General's Office and displayed a badge, which, Mr. Lawmaster avers, resembled that of a police officer. *Id.* ¶ 29. The ensuing, two-minute-long interaction was recorded on a recording device located at the front door and is transcribed in the Amended Complaint as follows:

Spivey: Here to talk to you about some of your internet activity.

Lawmaster: Yeah.

Spivey: Okay? A post you had made recently? You know what I'm talking about?

Lawmaster: Yeah.

Spivey: 'Kay. You remember what you posted?

Lawmaster: 86 somebody.

Spivey: You know what that means?

Lawmaster: No.

Spivey: No? Are you following the news with the Comey investigation and everything on—on the news about the previous FBI director being indicted over using that term with President Trump?

Lawmaster: Yeah, I heard about it.

Spivey: Okay, so you're aware of it. So, you understand that that's what the term '86' means?

Lawmaster: Just means get rid of.

Spivey: Okay. Let's you and I have a candid talk, okay?

Lawmaster: Mm-hm.

Spivey: You have the right to freedom of speech.

Lawmaster: Mm-hm.

Spivey: You have the right to say what you want. You have the right to have whatever opinion you want. I understand that. I respect it. Okay?

Lawmaster: Mm-hm.

Spivey: But you crossed the line—

Lawmaster: Okay.

Spivey: —with a threat like that. You know, maybe you and I can come to an agreement that we kind of tone down the political rhetoric a little bit.

Lawmaster: Mm-hm.

Spivey: Okay? Alright?

Lawmaster: Okay.

Spivey: When someone comes knocking on your door, obviously it's starting to go a little too far.

Lawmaster: Mm-hm.

Spivey: Is that fair enough?

Lawmaster: [Inaudible]

Spivey: Okay, how about this. Let's—uh—post your stuff, do your thing, you know, express your opinion, but when you start crossing that line that could be perceived as a threat, then we got issues and problems, right? Listen, if Comey was indicted, we could easily indict you over this today. Alright?

Lawmaster: Mm-hm.

Spivey: We don't need to do that, right?

Lawmaster: [Inaudible]

Spivey: How about if you agree to tone it down a little bit, I can go check a box saying you and I have had a talk—

Lawmaster: Mm-hm.

Spivey: —we've come to an agreement, and I can let this one slide. Does that sound fair?

Lawmaster: Mm-hm.

Spivey: Okay. Alright. Now, hopefully, we don't have to come back? Cool?

Lawmaster: Cool.

Spivey: Thank you, sir.

Lawmaster: No problem.

Spivey: Let's consider this issue, uh, put away. Okay?

Lawmaster: Okay.

Spivey: And just tone down that rhetoric.

Lawmaster: Will do.

Spivey: Okay. Have a good day.

Lawmaster: You, too.

Spivey: Okay. Take care.

Lawmaster: You, too.

*Id.* ¶ 30.

After Director Spivey departed from Mr. Lawmaster's residence, he learned from an unnamed employee of the Attorney General's Office (who had been monitoring Mr. Lawmaster's online activity) that Mr. Lawmaster had posted another "86" comment to the Attorney General's Facebook page a mere twenty minutes prior to Director Spivey and Mr. Lawmaster's interaction. *Id.* ¶ 39. In response to this new information, Director Spivey texted the source, "Let's see if he post [sic] anything else maybe we'll monitor." *Id.* According to the Amended Complaint, the Attorney General's Office allegedly collected information about Mr. Lawmaster's Facebook page dating back to 2011, though this information was not known by Director Spivey prior to his visit with Mr. Lawmaster. *Id.* ¶ 38.

The Amended Complaint avers that Director Spivey threatened Mr. Lawmaster by stating that "we could easily indict you over this today." *Id.* ¶ 33. By indicating that, "hopefully, we don't have to come back," Director Spivey also allegedly forewarned Mr. Lawmaster that his internet activity would continue to be monitored and might eventually warrant his prosecution. *Id.* ¶ 35. (Indeed, at least two others who have allegedly threatened the Attorney General have been or are being criminally prosecuted, according to the instant complaint. *Id.* ¶ 37.) Out of fear of criminal retribution, Mr. Lawmaster has since self-censored his speech by ceasing to post comments ("86"

or otherwise) on elected representatives' Facebook pages. *Id.* ¶ 36. Mr. Lawmaster has also allegedly discontinued his personal blog. *Id.*

## II. Litigation History

On May 7, 2026, a week after Director Spivey's visit, Mr. Lawmaster initiated this lawsuit against Director Spivey in his individual and official capacity alleging that Director Spivey's actions violated the First Amendment to the United States Constitution. Dkt. 1. In addition to preliminary (and eventually permanent) injunctive relief, Mr. Lawmaster seeks, *inter alia*, declaratory judgment and monetary damages. Am. Compl. 11, dkt. 21.

On May 13, 2026, Mr. Lawmaster moved for a preliminary injunction to enjoin Director Spivey from "taking any adverse action against Mr. Lawmaster because of [his] past social media posts using '86' or future posts using '86' or from taking any adverse action against Mr. Lawmaster for using any language that does not amount to a true threat as defined by the United States Supreme Court." Pl.'s Mot. Prelim. Inj. 1, dkt. 10. On July 27, 2026, as the parties completed initial discovery apropos of the preliminary injunction motion, Mr. Lawmaster filed his now-operative Amended Complaint. Dkt. 21. Two days later, on July 29, 2026, Mr. Lawmaster filed his brief in support of his Motion for Preliminary Injunction. Dkt. 23. Director Spivey filed his response brief in opposition on September 1, 2026, dkt. 34, and Mr. Lawmaster filed his reply on September 15, 2026, dkt. 38.

Meanwhile, on August 10, 2026, Director Spivey filed a motion to dismiss the Amended Complaint (as well as his supporting brief), pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Dkts. 29, 30. Director Spivey contends that Mr. Lawmaster lacks standing; that Mr. Lawmaster's claims are not ripe; that the Amended Complaint fails to allege a plausible First Amendment claim; and that, in any event, qualified immunity shields Director Spivey from

personal liability. Mr. Lawmaster responded in opposition on August 26, 2026. Dkt. 31. Director Spivey timely filed his reply brief on September 2, 2026. Dkt. 36.

Mr. Lawmaster's Motion for Preliminary Injunction [Dkt. 10] and Director Spivey's Motion to Dismiss [Dkt. 29] are fully briefed and ripe for ruling.

## LEGAL STANDARDS

### I. Motion to Dismiss for Lack of Subject Matter Jurisdiction

Under Federal Rule of Civil Procedure 12(b)(1), a federal court must dismiss an action where it lacks subject matter jurisdiction. In determining whether subject matter jurisdiction exists, a district court may properly "look beyond the jurisdictional allegations in the complaint" and "view whatever evidence has been submitted." *Roman v. U.S. Postal Servs.*, 821 F.2d 382, 385 (7th Cir. 1987).

### II. Motion to Dismiss for Failure to State a Claim

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility exists when a court can "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint need not identify legal theories, a complaint nonetheless must allege some facts that support whatever theory the plaintiff asserts." *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 633 (7th Cir. 2013).

### III. Preliminary Injunction

To obtain a preliminary injunction, the moving party must demonstrate: (1) a reasonable likelihood of success on the merits; (2) no adequate remedy at law; and (3) irreparable harm absent the injunction. *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d

962, 972 (7th Cir. 2012). If the moving party fails to demonstrate any one of these three threshold requirements, the injunctive relief must be denied. *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992).

If these threshold conditions are met, the Court must then assess the balance of harms—that is, the harm a denial would cause to Mr. Lawmaster against the harm an injunction would impose on Director Spivey—and determine the effect of an injunction on the public interest. *Speech First, Inc. v. Killen*, 968 F.3d 628, 637 (7th Cir. 2020) *as amended on denial of reh'g and reh'g en banc* (Sept. 4, 2020). "If the plaintiff is likely to win on the merits, the balance of harms need not weigh as heavily in his favor." *Id.*

**DISCUSSION**

Because jurisdictional considerations "come before [the] merits," we begin our analysis with Director Spivey's motion to dismiss under Rule 12(b)(1) and the threshold justiciability challenges asserted therein before turning to Director Spivey's arguments concerning the Amended Complaint's legal sufficiency. *Flynn v. FCA US LLC*, 39 F.4th 946, 951 (7th Cir. 2022). After resolving Director Spivey's Motion to Dismiss, we shall turn to Mr. Lawmaster's Motion for Preliminary Injunction.

**I. Director Spivey's Motion to Dismiss**

**A. (Facial) Standing**

"Federal courts are courts of limited jurisdiction, meaning we have authority to hear cases only where authorized by statute or permitted by the Constitution." *Satanic Temple, Inc. v. Rokita*, 163 F.4th 1061, 1066 (7th Cir. 2026) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). "Article III, Section 2 of the Constitution provides one such restriction, constraining our power to only deciding 'Cases' and 'Controversies.' " *Id.* (quoting U.S. Const. art. III,

§ 2). "To effectuate that limitation on our jurisdiction, we must be sure the plaintiff has a sufficient 'personal stake' in the case—in other words, standing to sue." *Id.* "To establish standing, the plaintiff must have (1) suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) that is fairly traceable to the challenged conduct of the defendant; and (3) that is likely to be addressed by a favorable judicial decision." *Id.* at 1067. In this case, Director Spivey does not challenge Mr. Lawmaster's standing to seek retrospective relief, dkt. 30 at 13, though he does contend that Mr. Lawmaster cannot satisfy the threshold requirements of injury in fact and redressability, both of which are prerequisites to his request for prospective relief.

Where, as here, the defendant has challenged our subject matter jurisdiction, we "must first determine whether a factual or facial challenge has been raised." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). A facial challenge, on one hand, "argues that the plaintiff has not sufficiently *alleged* a basis of subject matter jurisdiction whereas a factual challenge to subject-matter jurisdiction contends that there is *in fact* no subject matter jurisdiction, even if the pleadings are formally sufficient." *United States ex rel. Robinson v. HealthNet Inc.*, 124 F.4th 511, 517 (7th Cir. 2024) (citation modified) (emphasis in original). Director Spivey's challenge to Mr. Lawmaster's standing here is in substance largely if not entirely facial, though Director Spivey himself does not articulate as much. In any event, because Director Spivey has focused on whether the Amended Complaint adequately alleges standing, we shall treat his contentions as a facial challenge.[2]

[2] Indeed, not until his reply brief does Director Spivey direct us to "look beyond the pleadings" to the factual record developed on Mr. Lawmaster's Motion for Preliminary Injunction. Dkt. 36 at 9–10. In resolving Director Spivey's Motion to Dismiss, we address the issues as they have been raised and presented to us by the parties.

*1. Injury in fact*

An "alleged injury must be 'concrete and particularized' as well as 'actual or imminent, not conjectural or hypothetical . . . .' " *Sweeney v. Raoul*, 990 F.3d 555, 559 (7th Cir. 2021) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "[W]hen a deprivation of First Amendment rights is at stake, a plaintiff need not wait for the damage to occur before filing suit." *Mahmoud v. Taylor*, 606 U.S. 522, 559–60 (2025). Rather, as both parties agree here, a plaintiff can establish standing in one of two ways: The first is by alleging a future injury based on his "intention to engage in a course of conduct arguably affected by policy, and that he faces a credible threat that the policy will be enforced against him"; the second is by averring a current injury based upon "a chilling effect on his speech that is objectively reasonable, and that he [has] self-censor[ed] as a result." *Speech First*, 968 F.3d at 638 (internal citations omitted). Mr. Lawmaster has opted to proceed under the latter.

Notably, the "two theories of injury-in-fact often overlap," as "[b]oth require a plaintiff to allege a credible threat of enforcement against him." *McDonald v. Trs. of Indiana Univ.*, 186 F.4th 917, 926 (7th Cir. 2026). "Without one, a putative plaintiff can establish neither that he has an objectively good reason for refraining from speaking and self-censoring nor a realistic threat of legal sanction if he engages in the speech in question." *Id.* (citation modified). *See also Schirmer v. Nagode*, 621 F.3d 581, 586 (7th Cir. 2010) ("When plaintiffs do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible, they do not allege a dispute susceptible to resolution by a federal court.") (internal quotations omitted).

Our inquiry, here, therefore, is two-fold: We must assess whether Mr. Lawmaster has plausibly alleged that he has resorted to self-censorship out of a fear of coercion that is both "actual"

and "well-founded." *Brown v. Kemp*, 86 F.4th 745, 767 (7th Cir. 2023). "A plaintiff's fear of enforcement," or, in this case, of an official's allegedly coercive efforts to curtail free expression, "must be 'actual and reasonable,' not merely 'imaginary or speculative.' " *Wirtshafter v. Trs. of Indiana Univ.*, 784 F. Supp. 3d 1091, 1102 (S.D. Ind. 2025) (quoting *Brown*, 86 F.4th at 761). To suffice for standing purposes, the alleged chilling effect must be "objectively reasonable, not subjective." *Id.* (citation modified). That is, a plaintiff "cannot manufacture standing merely by inflicting harm on [himself] based on [his] fears of a hypothetical harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).

Applying the foregoing legal principles to the instant complaint, we hold that Mr. Lawmaster has adequately alleged a present First Amendment injury by virtue of his claimed self-censorship arising from an actual and well-founded fear of government coercion. Mr. Lawmaster has sufficiently identified in his complaint the speech in which he wishes to engage but from which his May 1st encounter with Director Spivey has allegedly caused him to refrain; to wit, posting comments of all varieties, including "86," on elected representatives' Facebook pages (out of fear of criminal retribution) as well as posting entries to his personal blog. Am. Compl. ¶ 36, dkt. 21. That Mr. Lawmaster has modified his behavior reflects the chilling of protected speech and supports an inference that he actually fears the prospect of future enforcement efforts against him.

Equally so, the Amended Complaint's factual averments support the inference that Mr. Lawmaster's fears of criminal retribution and/or future coercion are well-founded. As will be explored in greater detail below, "[t]he First Amendment forbids a public official to attempt to suppress the protected speech of private persons by threatening that legal sanctions will at his urging be imposed unless there is compliance with his demands." *Backpage.com, LLC v. Dart*, 807 F.3d 229, 231 (7th Cir. 2015). Director Spivey's alleged conduct here is more than sufficient to support

the inference that he employed coercive tactics to silence protected speech. The Amended Complaint alleges, in relevant part, that two days after Mr. Lawmaster commented "86 Todd Rokita" on the Attorney General's Facebook page, Director Spivey undertook an in-person (and surprise) visit to Mr. Lawmaster's home in Bloomington. During the two-minute interaction between the parties, Director Spivey briefly introduced himself as an investigator (for Indiana's highest legal officer) and displayed his badge, immediately thereafter informing Mr. Lawmaster that he had "crossed the line . . . with a threat like" his "86" comment. Am. Compl. ¶¶ 29–30, dkt. 21. Although Director Spivey seemingly invited Mr. Lawmaster to "post [his] stuff" and "do [his] thing," Director Spivey simultaneously cautioned, "Listen, if Comey was indicted, *we could easily indict you over this today*." *Id.* ¶ 30 (emphasis added). If, however, Mr. Lawmaster acceded to Director Spivey's admonition by "ton[ing] it down a little bit," Director Spivey indicated that he "c[ould] let this one slide" and "hopefully" would not need to "come back." *Id.* According to the complaint, at least two other persons who have made "what were considered threats to the Attorney General have been or are being criminally prosecuted." *Id.* ¶ 37. Following Director Spivey's visit, Mr. Lawmaster forthwith ceased his online activity which had garnered the attention of the state government. *Id.* ¶ 36.

Director Spivey rejoins that Mr. Lawmaster's self-inflicted censorship is unreasonable and that Mr. Lawmaster's theory of injury falls flat at the outset because there is no credible threat of prosecution or enforcement against him. According to Director Spivey, Mr. Lawmaster's alleged harm is in reality premised upon hypotheticals and contingencies—namely, that Director Spivey will deem his "86" comments as true threats, triggering further investigation and possibly prosecution. Dkt. 30 at 11–12. Critical to Director Spivey's argument is "the general rule in

Indiana . . . that the Attorney General cannot initiate prosecutions." *Doe v. Holcomb*, 883 F.3d 971, 977 (7th Cir. 2018).

That Director Spivey himself does not possess the authority to unilaterally employ the state's prosecutorial power does not foreclose Mr. Lawmaster's standing. To the contrary, it is well-established "that a public-official defendant['s] lack[ ] [of] direct regulatory or decisionmaking authority over a plaintiff . . . is not necessarily dispositive" of a First Amendment injury. *Backpage.com*, 807 F.3d at 230 (quoting *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003)). "A public-official defendant who threatens to employ coercive state power to stifle protected speech violates the plaintiff's First Amendment rights, regardless of whether the threatened punishment comes in the form of the use (or misuse) of the defendant's direct regulatory or decisionmaking authority over the plaintiff, or in some less-direct form." *Id.* at 230–31 (quoting *Okwedy*, 333 F.3d at 344). More to the point, "a threat is actionable and thus can be enjoined *even if it turns out to be empty*." *Id.* at 231 (emphasis added). Accordingly, Director Spivey's lack of prosecutorial authority to indict Mr. Lawmaster does not, under the facts alleged here, undermine Mr. Lawmaster's well-founded and credible fears of adverse government action.

Director Spivey also calls into question the legitimacy of Mr. Lawmaster's self-censorship on the grounds that Mr. Lawmaster's silence "rests on unfounded fears that First Amendment law will be misapplied" against him. Dkt. 30 at 11. Certainly, as Director Spivey highlights, a plaintiff whose alleged injury arises from the mere possibility that an unambiguous statute might be misapplied against him in the future generally cannot satisfy the requirements of standing. *See Bell v. Keating*, 697 F.3d 445, 451–52 (7th Cir. 2012). This uncontested legal principle does not deprive Mr. Lawmaster of standing: Irrespective of the veracity and/or legal correctness of the statements that Director Spivey made to Mr. Lawmaster during their May 1st interaction, the bottom line for

present purposes is that Director Spivey is alleged to have *told* Mr. Lawmaster in no uncertain terms that his "86 Todd Rokita" comment constituted a sufficient basis on which to initiate a criminal prosecution. What's more, Director Spivey "considered th[e] issue . . . put away" only *after* Mr. Lawmaster verbally agreed to curtail his speech. Am. Compl. ¶ 30, dkt. 21. Mr. Lawmaster's alleged fears are thus actual, well-founded, and credible, rather than simply attenuated and hypothetical.

Director Spivey's remaining arguments lack merit, primarily because they rest almost entirely on a reading of the Amended Complaint that rejects and/or misconstrues its core factual averments. At this juncture, we do not accept Director Spivey's competing narrative of the underlying facts, especially given that the Amended Complaint's factual allegations are clear: Director Spivey explicitly told Mr. Lawmaster, *inter alia*, that his "86" comment sufficed as grounds for an indictment, and as a result Mr. Lawmaster has since censored his speech. These averments are sufficient to establish that Mr. Lawmaster has and continues to suffer an injury in fact necessary to support his pursuit of prospective relief against Director Spivey.

*2. Redressability*

Redressability requires a showing that the plaintiff's asserted injuries are "likely to be redressed by a favorable decision." *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 38 (1976). Director Spivey challenges the redressability of Mr. Lawmaster's claim for injunctive relief, arguing that his alleged past injury is insufficient to establish his standing for a prospective remedy. Dkt. 30 at 12. Although Director Spivey frames his argument as one of redressability, it is in substance a reiteration of his contentions that Mr. Lawmaster has not suffered an injury-in-fact: He argues that Mr. Lawmaster's alleged injury is contingent upon Director Spivey "changing his mind

in the future and finding '86 Todd Tokita' to be a true threat," a referral to law enforcement, and a prosecutor's decision to initiate criminal proceedings. Dkt. 30 at 12.

As discussed above, the fact that Director Spivey himself is evidently not the sole official responsible for initiating criminal proceedings does not bar Mr. Lawmaster's effort to obtain redress. To the contrary, Mr. Lawmaster's alleged injuries could plausibly be remedied by an injunction that enjoins Director Spivey from undertaking additional efforts, "formal or informal, to coerce or threaten" Mr. Lawmaster to stifle his expression. Dkt. 31 at 17 (quoting *Backpage.com*, 807 F.3d at 239).

**B. Ripeness**

The doctrine of ripeness "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Sweeney*, 990 F.3d at 559–60 (citation modified). Claims "involv[ing] uncertain or contingent events that may not occur as anticipated" are unripe, thus depriving federal courts of jurisdiction to reach the merits. *Capeheart v. Terrell*, 695 F.3d 681, 684 (7th Cir. 2012) (citation omitted).

Director Spivey here contends that Mr. Lawmaster's claim for prospective relief is not ripe because its success depends upon speculative, contingent, and hypothetical future events that are, in Director Spivey's view, unlikely given that he has apparently "deemed Mr. Lawmaster's past online speech non-threatening." Dkt. 30 at 13. We can make quick work of Director Spivey's ripeness argument, since it does not differ in any meaningful way from his standing challenge, rejected above, and since it rests upon a competing view of the underlying factual circumstances that is not supported by the operative pleading. The instant controversy is ripe for review: Director Spivey instructed Mr. Lawmaster to modify his (disfavored) speech, and Mr. Lawmaster has allegedly done so.

**C. Legal Sufficiency of the Amended Complaint**

Director Spivey asserts that the Amended Complaint fails to state a First Amendment claim upon which relief can be granted. Specifically, Director Spivey contends that the Amended Complaint must be dismissed, pursuant to Federal Rule of Civil Procedure 12(b)(6), because it fails to identify a cognizable theory of recovery and because the factual averments do not support a viable claim.

Director Spivey's first assertion faults Mr. Lawmaster for his purported failure to specify the nature of his First Amendment theory. Dkt. 30 at 14. Under our well-established federal pleading rules, a complaint "must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. By contrast, "a complaint need not plead legal theories, and specifying an incorrect theory is not fatal." *Rabe v. United Air Lines, Inc.*, 636 F.3d 866, 872 (7th Cir. 2011). The instant complaint describes in detail the underlying factual circumstances that allegedly injured Mr. Lawmaster. *See generally* Am. Compl., dkt. 21. That the Amended Complaint does not spell out the precise First Amendment theory of recovery is immaterial to our assessment of its legal sufficiency. In any event, both parties recognize that Mr. Lawmaster has asserted a claim of government coercion, in violation of the First Amendment. We evaluate the sufficiency of Mr. Lawmaster's factual allegations in the context of his coercion claim, below.

There are two threads of First Amendment jurisprudence implicated in this case: First, "[a]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. Am. C.L. Union*, 535 U.S. 564, 573 (2002) (citation modified). This principle, however, "is not absolute." *Id.* (citation

modified). The First Amendment does "permit[ ] restrictions upon the content of speech in a few . . . , well-defined and narrowly limited" categories, including obscenity, incitement, and true threats. *United States v. Stevens*, 559 U.S. 460, 468–69 (2010) (citation modified). "True threats," relevant here, "are 'serious expressions' conveying that a speaker means to 'commit an act of unlawful violence.' " *Counterman v. Colorado*, 600 U.S. 66, 74 (2023) (quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003)) (citation modified). "The 'true' in that term distinguishes what is at issue from jests, 'hyperbole,' or other statements that when taken in context do not convey a real possibility that violence will follow." *Id.* In true-threat cases, the government must prove that the speaker (subjectively) "had some understanding of his statements' threatening character." *Id.* at 73.

In this case, Director Spivey asserts that the purpose of his visit with Mr. Lawmaster was to "assess[ ] a flagged potential veiled threat of violence," dkt. 30 at 15, though he does not argue that Mr. Lawmaster's "86" comment constituted a "true threat" (or any other type of unprotected speech). Thus, for purposes of this order, we assume that Mr. Lawmaster engaged in protected First Amendment activity by posting his "86" comment(s) on Facebook.

The second First Amendment principle bearing on the legal sufficiency of the instant complaint is the well-established rule that "[t]he First Amendment forbids a public official to attempt to suppress the protected speech of private persons by threatening that legal sanctions will at his urging be imposed unless there is compliance with his demands." *Backpage.com*, 807 F.3d at 231. "[A] public official who tries to shut down an avenue of expression of ideas and opinions through actual or threatened imposition of government power or sanction is violating the First Amendment." *Id.* at 230 (citation modified). "Threatening penalties for future speech goes by the name of 'prior restraint,' and a prior restraint is a quintessential first-amendment violation." *Id.* at 235 (quoting *Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009)).

"What matters is the distinction between attempts to convince and attempts to coerce." *Id.* (quoting *Okwedy*, 333 F.3d at 344). "Government officials cannot attempt to coerce private parties in order to punish or suppress view that the government disfavors." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 180 (2024). "To state a claim that the government violated the First Amendment through coercion . . . a plaintiff must plausibly allege that conduct, viewed in context, could reasonably be understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." *Id.* at 191.[3]

Applying these legal principles to the complaint at bar, we have little trouble concluding that Mr. Lawmaster has plausibly alleged that Director Spivey's conduct, viewed in the context of the parties' interaction, was reasonably understood to convey a threat of adverse government action intended to curtail Mr. Lawmaster's speech. The Amended Complaint avers that Director Spivey arrived at Mr. Lawmaster's home, displayed his official badge, and introduced himself as in investigator before informing Mr. Lawmaster that he had "crossed the line" and could "easily [be] indict[ed] over" his "86" comment unless he "agree[d] to tone it down a little bit," in which case Director Spivey would "let this one slide." Am. Compl. ¶ 30, dkt. 21. As alleged, Director Spivey's conversation with Mr. Lawmaster, albeit brief, "can be reasonably understood as a threat or as an inducement," either of which is sufficiently coercive to support Mr. Lawmaster's claim. *Nat'l Rifle Ass'n*, 602 U.S. at 193.

[3] We recognize that the Supreme Court's 2024 decision in *National Rifle Association* (and its progenitor *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963)) as well as the Seventh Circuit's 2015 opinion in *Backpage.com* concerned government coercion against third parties, rather than against the speakers themselves. Although the instant case differs in that the alleged coercion occurred against the speaker (Mr. Lawmaster), we view these binding authorities, which both parties have cited, as supplying the relevant legal principles.

None of Director Spivey's contentions to the contrary warrant dismissal of the Amended Complaint. First, Director Spivey's attempt to recast his conversation with Mr. Lawmaster as a mere "threat assessment" does not undermine the plausible inference drawn from the pleadings that his communication with Mr. Lawmaster crossed the line from persuasion (and/or investigation) to unlawful coercion. Nor do we read the Amended Complaint to be taking issue with the proposition that the Attorney General's Office and its personnel may investigate potential threats without offending the First Amendment. *See Bantam Books*, 372 U.S. at 71–72 ("We do not hold that law enforcement officers must renounce all informal contacts with persons suspected of violating valid laws . . . , [w]here such consultation is genuinely undertaken with the purpose of aiding the [speaker] to comply with such laws and avoid prosecution under them."). That Director Spivey might have had a legitimate basis upon which to conduct a so-called "threat assessment" does not undermine the legal sufficiency of the Amended Complaint. After all, the crux of this case is the allegedly coercive methods that Director Spivey employed during the course of his purported investigation—not the bare fact of the investigation itself—in order to obtain Mr. Lawmaster's silence.

Director Spivey's remaining arguments in support of his request for dismissal stem from his competing view of the factual allegations. According to him, "the complaint describes a brief, courteous, and consensual two-minute conversation in which Director Spivey investigated a social media post that had been flagged as a potential veiled threat against the Attorney General, repeatedly affirmed Mr. Lawmaster's right to speak and to hold and express his opinions, concluded that the post was political rhetoric, and closed the matter." Dkt. 30 at 14. Continuing, Director Spivey characterizes his word choice as "de-escalatory" and his statement that "we could easily indict you over this today" as a mere "colloquial aside." *Id.* at 17. Director Spivey also emphasizes his (and

the Attorney General Office's) lack of criminal enforcement authority as demonstrating the non-coercive nature of his encounter with Mr. Lawmaster.

Director Spivey's retelling of the salient factual averments does not diminish the Amended Complaint's legal sufficiency. Neither the politeness of the parties' interaction nor Director Spivey's purported assurances—e.g., "[y]ou have the right to freedom of speech" and "post your stuff, do your thing, you know, express your opinion," Am. Compl. ¶ 30, dkt. 21—conclusively establish the non-coercive nature of Director Spivey's conduct at the pleading stage. Similarly, that Mr. Lawmaster apparently did not (and has not) credited Director Spivey's ostensible affirmations of Mr. Lawmaster's First Amendment rights does not render Mr. Lawmaster's alleged self-censorship unreasonable. After all, "[p]eople do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around . . . ." *Bantam Books*, 372 U.S. at 68.

For these reasons, we conclude that the operative complaint plausibly alleges a claim of government coercion, in violation of the First Amendment. Director Spivey's remaining contentions to the contrary far exceed our review of the pleadings and thus do not warrant further discussion at this juncture.

**D. Qualified Immunity**

Director's Spivey's final assertion in support of dismissal is that Mr. Lawmaster's individual-capacity damages claim is barred by qualified immunity. "Qualified immunity protects government officials from civil liability when performing discretionary functions so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001) (citation modified). "Qualified immunity balances two important interests—the need to hold public officials

accountable when they exercise their power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018).

An official is entitled to qualified immunity unless a plaintiff establishes that (1) the official violated a statutory or constitutional right and (2) the right was clearly established. *Id.* "If either inquiry is answered in the negative, the defendant official is protected by qualified immunity." *Id.* (citation modified). In this case, Director Spivey asserts that Mr. Lawmaster cannot satisfy the second prong requiring that the allegedly violated right was clearly established.

Dismissal under Rule 12(b)(6) is not "always (if ever) the most suitable procedural setting to determine whether an official is qualifiedly immune, because immunity may depend on particular facts that a plaintiff need not plead to state a claim." *Hanson v. LeVan*, 967 F.3d 584, 589 (7th Cir. 2020). Nevertheless, "dismissal under Rule 12(b)(6) is appropriate based on qualified immunity only when the plaintiffs' well-pleaded allegations, taken as true, do not 'state a claim of violation of clearly established law.' " *Id.* at 590 (quoting *Behrens v. Pelletier*, 516 U.S. 299, 306 (1996)). Qualified immunity applies "where the plaintiff asserts the violation of a broad constitutional right that had not been articulated at the time the violation is alleged to have occurred." *Id.* (citation modified).

"[B]ecause we are at the 12(b)(6) stage, [Mr. Lawmaster] receive[s] the benefit of all plausible allegations and reasonable inferences being treated as true." *Id.* at 596. Consequently, we accept that Mr. Lawmaster's "86" comments and "political rhetoric," Am. Compl. ¶ 30, dkt. 21, constituted protected speech. Dkt. 31 at 28. We also take as given that Director Spivey obtained Mr. Lawmaster's silence by way of the statements he made during their May 1st encounter. To resolve the qualified immunity argument raised here, we must assess whether a reasonable

investigator in Director Spivey's shoes would have understood that his conduct crossed the line from permissible persuasion to impermissible coercion.

Mr. Lawmaster relies primarily upon two cases for the proposition that, at the time of Director Spivey's May 1st visit, it was clearly established that a state official, irrespective of his actual enforcement power, may not attempt to chill expressive activity through threats of legal sanctions or other forms of coercion: *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) and *Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015). Both are instructive.

The Supreme Court's 1963 decision in *Bantam Books* established that government officials cannot coerce private parties to suppress disfavored speech. 372 U.S. at 67–69. In *Bantam Books*, a state commission that possessed the power to investigate and to recommend prosecution employed coercive tactics to censor "objectionable" publications by sending official notices of blacklisted publications to a distributor. *Id.* at 59–62. The notices reminded their recipient of the commission's "duty to recommend to the Attorney General" potential prosecutions; informed the distributor that blacklisted publications had been circulated among local police departments; and advised that the distributor's cooperation in removing certain publications from the shelves would eliminate the need for any potential referral for prosecution. *Id.* at 62–63 & n.5. Police officers also conducted follow up visits. *Id.* at 68. The distributor responded to these notices by "t[aking] steps to stop further circulation of copies of the listed publications" in order to "avoid becoming involved in a court proceeding." *Id.* at 63 (citation modified).

The publishers of the blacklisted materials sued the commission averring that this scheme of informal censorship infringed upon their First Amendment rights. Importantly, the Supreme Court rejected the commission's contention that "it d[id] not regulate or suppress obscenity but simply exhort[ed] booksellers and advise[d] them of their legal rights." *Id.* at 66. The fact that the

commission lacked the power to "apply formal legal sanctions" similarly did not undercut the reasonableness of the distributor's fears that adverse actions could be taken against it.

The Seventh Circuit's 2015 decision in *Backpage.com* is also illuminating. In *Backpage.com*, the Seventh Circuit reversed and remanded a district court's denial of a preliminary injunction that sought to stop the Cook County sheriff's "campaign of starving" Backpage.com, an online forum for classified advertisements, "by pressuring credit card companies to cut ties with its website." *Backpage.com*, 607 F.3d at 230. The sheriff in that case had sent a letter on official letterhead to credit card companies, urging them to "cease and desist from allowing [their] credit cards to be used to place ads on websites like Backpage.com." *Id.* at 231. The sheriff's letter also cited the federal money-laundering statute, "intimating that the credit card companies could be prosecuted," albeit not by the sheriff himself. *Id.* at 232. The letter encouraged its recipients to provide contact information for a person who could "work with" the sheriff on the issue, and, two days after the sheriff sent the letter, the sheriff's office issued a press release celebrating that the sheriff's "demand to defund sex trafficking [had successfully] compel[ed] Visa and MasterCard to sever ties with Backpage.com." *Id.* In that case, the Seventh Circuit concluded that "the letter was not merely an expression of [the sheriff's] opinion. It was designed to compel the credit card companies to act by inserting [the sheriff] into the discussion." *Id.* Although a government entity "is entitled to say what it wants to say . . . , [i]t is not permitted to employ threats to squelch the free speech of private citizens." *Id.* at 235.

One additional authority is relevant to our analysis: The Supreme Court's 2024 decision in *National Rifle Association of America v. Vullo* recently reaffirmed the distinction between coercion and persuasion. In *National Rifle Association*, the Court held that the National Rifle Association (the "NRA") plausibly alleged that the superintendent of the New York Department of Financial

Services had violated the First Amendment by pressuring regulated entities to terminate their business relationships with the NRA in order to punish or suppress gun-promotion advocacy. 602 U.S. at 191.[4] The bottom line was "that a government official cannot do indirectly what she is barred from doing directly: A government official cannot coerce a private party to punish or suppress disfavored speech on her behalf." *Id.* at 190.

Together, *Bantam Books*, *Backpage.com*, and *National Rifle Association* clearly establish that the "First Amendment prohibits government officials from wielding their power selectively to punish or suppress speech, directly or . . . through private intermediaries." *NRA*, 602 U.S. at 198. That is, government officials may not "rely[ ] on the 'threat of invoking legal sanctions and other means of coercion to achieve the suppression' of disfavored speech." *Id.* at 189 (quoting *Bantam Books*, 372 U.S. at 67).

Returning to the case at bar and viewing the relevant factual allegations and reasonable inferences as true, we hold that Mr. Lawmaster has plausibly alleged that Director Spivey induced Mr. Lawmaster to chill his speech by threatening adverse action against him, in violation of clearly established law. Based on the foregoing authorities, a reasonable official would have understood that he was violating Mr. Lawmaster's rights by stating, as Director Spivey allegedly did here, that Mr. Lawmaster's online speech (namely, his "86" comment) had "crossed the line," warning Mr. Lawmaster that he "could easily [be] indict[ed] . . . over this today," and promising that he could

---

[4] On remand, the Second Circuit resolved the separate issue of qualified immunity and held that, at the time of the underlying events, "no case had clearly established that a regulator could indirectly infringe the First Amendment rights of one entity by coercing third-party associates into refraining from nonexpressive, nonspeech activity." *Nat'l Rifle Ass'n v. Vullo*, 144 F.4th 376, 392 (2d Cir. 2025). Given that Director Spivey's allegedly coercive conduct here was directly aimed at Mr. Lawmaster's expressive activity—and thus was not nearly as attenuated as that at issue in *National Rifle Association*—we do not view the Second Circuit's opinion as persuasive authority in support of Director Spivey's qualified immunity defense.

"let this one slide" if Mr. Lawmaster agreed to refrain from further disfavored speech. Am. Compl. ¶ 30, dkt. 21.

Director Spivey's contentions to the contrary are premised on his view that the nature of his interaction with Mr. Lawmaster was "brief, voluntary, [and] civil." Dkt. 30 at 21. According to Director Spivey, no clearly established law would have put a reasonable investigator on notice that a conversation of the sort that Director Spivey shared with Mr. Lawmaster—during which he "affirm[ed]" Mr. Lawmaster's speech rights, requested that he "voluntarily 'tone down' his rhetoric," and "close[d] the matter on the spot"—violated the First Amendment. *Id.* Aside from Director Spivey's characterization of his two-minute conversation with Mr. Lawmaster as "brief," none of Director Spivey's remaining factual assertions fairly align with the content of the pleading and/or the reasonable inferences drawn therefrom. At bottom, the Amended Complaint avers that Director Spivey obtained Mr. Lawmaster's silence by appearing on Mr. Lawmaster's front porch under the auspices of his position as Director of Investigations for the Attorney General's Office, invoking the threat of an indictment, and promising to turn a blind eye if Mr. Lawmaster curtailed his expression. Am. Compl. ¶ 30, dkt. 21.[5] These allegations do not support the conclusion urged by Director Spivey that Mr. Lawmaster's silence is merely "voluntary." In the context of Mr. Lawmaster's factual averments, a reasonable official would have understood that leveraging a potential indictment and offering to "let this one slide" upon the speaker's agreement to "tone down the political rhetoric" accomplishes what the First Amendment prohibits: to wit, invoking government power to suppress disfavored speech.

[5] Director Spivey also argues that he had "cause" to investigate Mr. Lawmaster's "86" comment as a potential threat against the Attorney General and that his doing so did not violate any of Mr. Lawmaster's clearly established rights. Dkt. 30 at 22. Because we do not read Mr. Lawmaster's complaint as taking issue with Director Spivey's exercise of his investigatory discretion, this issue warrants no further discussion at this time.

For these reasons, Director Spivey's Motion to Dismiss must be **denied** in its entirety. Dkt. 29.

## II. Mr. Lawmaster's Motion for Preliminary Injunction

### A. Preliminary Injunction Factual Record

#### *1. Mr. Lawmaster's Social Media Usage*

Mr. Lawmaster is an active user of social media, including Facebook, Reddit, and his personal blog, where he frequently posts comments on current affairs and social issues. Lawmaster Decl. ¶¶ 2–4, dkt. 22-1. While Mr. Lawmaster does not 'follow' Attorney General Rokita (or many other political figures) on Facebook, posts from these persons often appear in his Facebook newsfeed. *Id.* Mr. Lawmaster typically reviews these posts and, if they anger or frustrate him, he may mark them as something he does not want to see in his Facebook feed in the future. *Id.* He may also leave comments on these posts and wants the ability to do so in the future. *Id.*

#### *2. Director Spivey & the Attorney General's Investigation Division*

Director Spivey has been employed as Director of Investigations for the Indiana Attorney General since April 13, 2026. Spivey Dep. 4:11–12, 8:22–24, dkt. 22-2. Director Spivey is also a certified police officer who possesses more than twenty-five years of law enforcement experience that precedes his tenure with the Attorney General's Office. *Id.* at 16:9–17:23. Director Spivey continues to maintain his police officer certification and, as such, holds arrest powers under Indiana law. *Id.* at 20:21–21:24.

As Director of Investigations, Director Spivey oversees the Investigations Division, which is tasked with investigating tort claims and reported threats (e.g., threats against the secretary of state's office, social media threats, school threats, bomb threats, etc.) as well as Attorney General initiatives, such as voter fraud, unlawful employment practices, and human trafficking. *Id.* at 14:2–

15:1, 26:17–28:5. The Investigations Division receives investigation assignments through constituent reports, requests from other divisions of the Attorney General's Office, and "calls from other law enforcement agencies that feel" the Attorney General's Office is "a better fit." *Id.* at 22:25–24:2. The Attorney General himself does not assign investigatory assignments directly, however. *Id.* at 24:8–10.

In his capacity as Director of Investigations, Director Spivey has been apprised of eight threat investigations, three of which have been referred to other law enforcement agencies for further investigation and potential prosecution. *Id.* at 27:14–28:6. The decision to prosecute, however, lies within the discretion of the agency "that takes over the matter." *Id.* at 28:8–10. There have been at least two criminal cases filed involving threats to the Attorney General himself, though Director Spivey has not been involved in those proceedings. *Id.* at 28:11–16.

*3. Constituent Report & the Subsequent Investigation*

On April 30, 2026, shortly after the announcement of Director Comey's highly publicized and controversial indictment for sharing on social media an image depicting the message "8647," Mr. Lawmaster began posting "86 [official's name]" comments on the Facebook pages of various state and federal officials, including those of Indiana Attorney General Todd Rokita; Senators Jim Banks, Todd Young, and Bernie Moreno; and Representatives Erin Houchin and Clay Fuller. Lawmaster Dep. 33:15–35:4, dkt. 35-1. During his deposition testimony, Mr. Lawmaster described his motive for the "86" comments as arising from his overall dissatisfaction with state government and "the hate and vitriol that several . . . state politicians put out on social media as being okay." *Id.* at 36:1–5. His "86" comments, in Mr. Lawmaster's words, allowed him to "[l]et out frustration." *Id.* at 36:8.

In addition to his "86" comments, Mr. Lawmaster responded to a friend's Facebook post, "I keep commenting 86 plus name on all political pages now. It's quite fun. Let's see what happens." *Id.* at 38:4–9. By describing his commenting spree as "fun," Mr. Lawmaster intended to convey that "[i]t was quite fun to get that frustration off [his] chest." *Id.* at 38:21–23. By stating, "[l]et's see what happens," Mr. Lawmaster explained during his deposition, he meant "let's see if anybody investigates my words, let's see what kind of environment we're truly in today." *Id.* at 38:15–17. (Although Mr. Lawmaster "did not expect or think [he] would be investigated or have a knock on [his] door," he conceded that "one of the possibilities" of "anything [that could] happen" included investigators coming to his door. *Id.* at 41:10–12, 19–24.)

On April 30th, a constituent reported Mr. Lawmaster's "86 Todd Rokita" comment to the Attorney General Office's outreach team, who forwarded the report to Executive Protection Director Jeremy Steward ("Mr. Steward"). Mr. Steward phoned Director Spivey and relayed the report, prompting Director Spivey and a non-party deputy director to take a closer look at Mr. Lawmaster's comments to determine whether they qualified as a "potential threat" against Attorney General Rokita. *Id.* at 32:45–33:14. Although Director Spivey was "aware" that Mr. Lawmaster had engaged in "other political rhetoric and speech," his primary concern was Mr. Lawmaster's "86 Rokita" comment. Spivey Dep. 32:15–22, dkt. 22-2. Indeed, Director Spivey's initial assessment of Mr. Lawmaster was limited to his more recent Facebook activity, a review of which did not reveal any additional "danger signs" or "red flags" in Director Spivey's opinion. *Id.* at 44:15–44:12. The Attorney General's Office also prepared a preliminary "Security Risk Report," which provided a general overview of Mr. Lawmaster's background and personal history. *Id.* at 33:4–34:13, 101. Although Director Spivey did not review the report itself prior to his visit with Mr. Lawmaster, the

information contained therein, including a prior domestic violence incident, was relayed to Director Spivey telephonically. *Id.* at 36:2–37:9.[6]

At the time, Director Spivey understood through his own research that the term "86" "came from the restaurant industry and it had to do with removing items that were either sold out or no longer available." *Id.* at 38:5–14. In the context of Director Comey's indictment, the "numerous threats and attempts on the life of the president," and the fact that "humans aren't on menus," Director Spivey concluded that further investigation into Mr. Lawmaster was warranted. *Id.* at 38:15–39:25. This "deeper" investigation entailed Director Spivey making a personal visit to Mr. Lawmaster's home. *Id.* at 39:25–40:3.

*4. The Parties' May 1st Encounter*

On May 1, 2026, Director Spivey traveled to Mr. Lawmaster's home in Bloomington, Indiana. Mr. Lawmaster's home security monitor as well as Director Spivey's personal audio recording device captured the parties' interaction on Mr. Lawmaster's front porch. The footage, which both parties agree accurately represents their May 1st encounter, has been submitted as evidence. Our review of these recordings reveals that the Amended Complaint accurately captured the parties' conversation, and, as such, we regard the conversation, recited above, as part of the evidentiary record without repeating the dialogue below.

Director Spivey carries on his person two badges: one reflecting his position as a chief investigator for the Attorney General's Office and another marked as "police," which Director Spivey uses when he is conducting criminal investigations. *Id.* at 19:18–20:13, 62:24–63:12. As Director Spivey stated during his deposition, the investigator badge is "small" and "hard to read."

[6] The Security Risk Report reveals Mr. Lawmaster's 2016 misdemeanor guilty pleas resulting in a conviction for domestic battery and battery resulting in bodily injury, though the conviction was vacated and dismissed a year later. Dkt. 22-2 at 102.

*Id.* at 63:15. When Director Spivey interacted with Mr. Lawmaster he was wearing plain clothes attire and decided to display his investigator badge. *Id.* at 20:2–5. In his declaration, Mr. Lawmaster recalled, "It looked like a badge that a police officer would carry and I certainly believed that he was a police officer of some type and that he was speaking for the Office of the Attorney General as a law enforcement officer when he spoke to me." Lawmaster Decl. ¶ 18, dkt. 22-1.

*5. Post-Encounter Conduct*

After his conversation with Mr. Lawmaster, Director Spivey stated into his recorder: "Subject was cooperative, understanding. We seemed to have an agreement that he would tone that down a little bit, and hopefully that's the end of this with Lee Lawmaster." Audio at 04:49–05:03, dkt. 28 (manual filing). (This statement was made outside of Mr. Lawmaster's presence. Lawmaster Decl. ¶ 17, dkt. 22-1.) A couple hours later, Director Spivey was alerted via a text message from another employee of the Attorney General's Office to an additional "86 Todd Rokita" comment that Mr. Lawmaster had posted on Facebook approximately twenty minutes before Director Spivey appeared at his front door. In response to this information, Director Spivey wrote, "Let's see if he post [sic] anything else maybe we'll monitor." Dkt. 22-2 at 340.[7]

Mr. Lawmaster, meanwhile, reentered his home and relayed a summary of the interaction to his then-fiancé before contacting two of his "attorney friends." Lawmaster Dep. 49:20–25, 51:5–12, dkt. 35-1. Through these attorneys, neither of whom represents Mr. Lawmaster in this case, Mr. Lawmaster learned that "the Attorney General's Office does not have [arrest] powers" and "generally ask[s] local law enforcement" to do so. *Id.* at 49:10–16. During his deposition, Mr.

[7] During his deposition, Director Spivey described this text message response as his "trying to ease [his co-worker] off a little bit," since he "left this interview with no more concern about this than [he] did when [he] got there." Spivey Dep. 78:1–13, dkt. 22-2. Whatever Director Spivey's intent might have been, we do not regard his *post hoc* explanation as particularly strong evidence for his defense.

Lawmaster explained his understanding that the Attorney General's Office cannot "directly" indict or arrest him but can "indirectly" accomplish both. *Id.* at 134:8–21. Mr. Lawmaster also transmitted the video footage to a local reporter friend with the message, "Feel free to use the video if you want for a story, just edit me out and make it anon[ymous]." *Id.* at 58:19–24. No story was ultimately published about the incident, however. *Id.* at 60:22–23.

*6. Mr. Lawmaster's Self-Censorship*

Director Spivey's conversation with Mr. Lawmaster left Mr. Lawmaster with the impression that, by making the "86" comment, he "had done something that could subject [him] to criminal prosecution"; that he "had crossed the line into criminal behavior"; and "that if [he] did it again [he] might be visited again by law enforcement." Lawmaster Decl. ¶ 19, dkt. 22-1. Continuing, Mr. Lawmaster states in his declaration that "Director Spivey was clear that in order to avoid . . . future visits and, presumably, potential prosecution, [Mr. Lawmaster] needed to tone down what [he] was doing." *Id.* ¶ 20. With regard to Director Spivey's statement that Mr. Lawmaster had crossed "the line," Mr. Lawmaster "understood that other political comments could be considered by the Office of the Attorney General and law enforcement as crossing the 'line' into criminal behavior." *Id.* ¶ 22. Mr. Lawmaster, however, "ha[s] no idea where Director Spivey and the Office of the Attorney General believe[ ] that line to be," as "Director Spivey certainly did not tell [Mr. Lawmaster." *Id.*

Since Director Spivey's visit, Mr. Lawmaster has stopped making "86" comments and has refrained from posting comments to Facebook pages run by public officials or agencies, though he would like to resume doing so. *Id.* ¶¶ 23–25. In Mr. Lawmaster's words, he is "censoring [him]self to not cross the 'line' that Director Spivey said existed, to avoid any more visits from Director Spivey, and to avoid any of the adverse consequences that he indicated could occur." *Id.* ¶ 26. Mr.

Lawmaster has also placed his personal blog in maintenance mode, meaning that it is inaccessible to the public. *Id.* ¶ 27.

During his deposition, Mr. Lawmaster testified that, since May 1, 2026, the frequency with which he posts on Facebook has "definitely altered in a negative trend." Lawmaster Dep. 15:4–8, dkt. 35-1. Indeed, Mr. Lawmaster testified that he has limited his political engagement on social media to matters of local concern. *Id.* at 70:21–71:4, 98:5–13. *See also* dkt. 35-2 at 8–10, 19–20 (Mr. Lawmaster's excerpted Facebook activity). By contrast, Mr. Lawmaster has refrained from posting his thoughts on matters of Indiana state politics and from commenting on elected officials' Facebook pages. Lawmaster Dep. 71:1–2, 72:2–6, dkt. 35-1. He has also abstained from making "86" comments on officials' pages, *id.* at 74:12–75:18, and he generally "stay[s] away from politicians' posts" and "limit[s] [his] Facebook intake to looking at [his] memories only." *Id.* at 76:3–9. (Due to the fact that Mr. Lawmaster "do[es] not follow most politicians on any social media platforms," he "rarely see[s] their content," meaning that he "[r]arely, if ever, . . . post[s] any comments or anything on politicians' social media." *Id.* at 70:5–12. That said, Mr. Lawmaster also testified that "Facebook's algorithm" pushes political content into his feed. *Id.* at 76:22–77:5.)

### B. Likelihood of Success on the Merits

The parties' disagreement concerning Mr. Lawmaster's standing to seek prospective relief has reemerged in the context of their preliminary injunction submissions. In their second round of briefing, however, the parties expounded upon their arguments by incorporating in greater detail the underlying evidentiary record. We address those arguments below.

#### *1. Article III Jurisdiction: (Factual) Standing & Ripeness*

Mr. Lawmaster's "burden to demonstrate standing in the context of a preliminary injunction motion is 'at least as great as the burden of resisting a summary judgment motion.' " *Speech First*,

968 F.3d at 638 (quoting *Lujan*, 497 U.S. at 907 n.8). At this stage, Mr. Lawmaster "must set forth by affidavit or other evidence specific facts, rather than general factual allegations of injury." *Id.* (citation modified). Based on our review of the instant record, we hold that Mr. Lawmaster has satisfied this burden.

As explained above, Mr. Lawmaster's First Amendment injury arises from the chilling effect on his speech and his self-censoring as a result. In opposition to Mr. Lawmaster's Motion for Preliminary Injunction, Director Spivey contends that Mr. Lawmaster lacks standing because he cannot establish an injury in fact and/or that his injuries are redressable. Because Director Spivey "contends that there is *in fact* no subject matter jurisdiction," we treat his standing arguments as a factual, rather than facial, attack on our jurisdiction. *United States ex rel. Robinson*, 124 F.4th at 517 (citation modified) (emphasis in original).

Injury in fact: Director Spivey asserts that Mr. Lawmaster has not suffered a redressable First Amendment injury because Mr. Lawmaster has not self-censored his speech; because any chilling effect on his speech is not reasonable; and because he faces no credible threat of enforcement. As outlined below, none of these contentions are availing.

During his deposition, Mr. Lawmaster testified that, since May 1, 2026, his social media commentary has been limited to matters of local concern and that he has otherwise refrained from weighing in on state and national political issues. Lawmaster Dep. 15:4–8, 70:21–71:4, 72:2–6, 98:5–13, dkt. 35-1. He has also abstained from making "86" comments on officials' social media pages, *id.* at 74:12–75:18, though he "would like to be able to do so" without running afoul of Director Spivey's directive, Lawmaster Decl. ¶ 25, dkt. 22-1.

In Director Spivey's telling, Mr. Lawmaster's engagement in *some* online political discourse demonstrates that he has not self-censored his speech. Director Spivey also argues that any

purported self-censorship by Mr. Lawmaster is driven by litigation strategy, rather than fear of retribution. Director Spivey cites no legal authority, binding or otherwise, for the proposition that First Amendment plaintiffs must refrain from all protected expressive activity in order to establish that their speech has been chilled. That Mr. Lawmaster has engaged in matters concerning Bloomington and/or Monroe County (i.e., purely local) politics does not undermine his allegation, as supported by his deposition testimony, that Director Spivey's May 1st visit has chilled other aspects of his protected speech. *See Rhodes v. Robinson*, 408 F.3d 559, 568 (9th Cir. 2005) ("Speech can be chilled even when not completely silenced.").

Director Spivey's argument that Mr. Lawmaster's fear of reprisal is merely litigation-driven is similarly unavailing. Mr. Lawmaster's deposition testimony clearly reflects that he has stifled his speech on matters of state and national importance and that he has refrained from posting additional "86" comments because he "worr[ies] that [he] will be charged with some sort of intimidation." Lawmaster Dep. 78:6–7, dkt. 35-1. Director Spivey's competing characterization of the record (e.g., that Mr. Lawmaster is "[n]ot really" afraid, dkt. 34 at 15)[8] does not survive scrutiny, as he has either unfairly extrapolated from or plainly misrepresented Mr. Lawmaster's deposition

---

[8] The colloquy from which this excerpt was quoted reads, in full:

Q: So you're not afraid of any governmental retribution; is that fair?

A: It's very hard for me to answer. Part of me wants to say yes, but there's a large part of me that also says no. You've met a man of two minds. Am I afraid of having a solid reputation tarnished by retribution by the state? Yes. Am I afraid of imprisonment of things of that nature? Not really.

Q: Maybe we're getting hung up on the word fear. So I don't mean to get hung up on that phrase. What specifically do you think will happen to you if you post 86 on another elected official's page or General Rokita's page?

A: I worry that I will be charged with some sort of intimidation or charged in the line of that.

Q: Anything else?

A: Those are the best words I have to answer that.

Lawmaster Dep. 77:17–78:9, dkt. 35-1.

testimony. Nor does Mr. Lawmaster's stated interest in "want[ing] to hear what a court has to say before [he] make[s] any further comments" advance Director Spivey's theory. *Id.* at 132:23–25. Mr. Lawmaster's silence as he awaits a ruling on his request for relief underscores, rather than undermines, the chilling effect of Director Spivey's directive.

Director Spivey also challenges the objective reasonableness of Mr. Lawmaster's self-censorship on the grounds that Mr. Lawmaster "tried to insert himself into the '86' political debate," which is, in Director Spivey's view, reflected in Mr. Lawmaster's Facebook comment to a friend that posting "86 plus name on all political pages" was "quite fun. Let's see what happens." Dkt. 34 at 15. Director Spivey also points to evidence that Mr. Lawmaster promptly contacted counsel and transmitted the video footage to a reporter as revealing Mr. Lawmaster's mindset towards "building a lawsuit." *Id.* at 16.[9] Of course, that Mr. Lawmaster foresaw the possibility of government overreach in response to what Director Spivey himself describes as a political debate does not amount to conclusive proof that Mr. Lawmaster's First Amendment rights have not been objectively chilled.

Because the preliminary injunction record confirms what Mr. Lawmaster alleges in the Amended Complaint, we can make short work of Director Spivey's remaining contentions, as our facial standing analysis is not affected. As succinctly summarized by Mr. Lawmaster, Director

[9] Director Spivey also repeatedly calls attention to the fact that Mr. Lawmaster apparently did not preserve footage that a security camera inside his home would have captured of his conduct in the immediate aftermath of Director Spivey's visit. Dkt. 34 at 7, 16 (arguing that Mr. Lawmaster "allowed video evidence of his immediate reaction . . . to be destroyed while ensuring the ring camera footage he perceived as helpful to his claims was preserved"). The relevance of this purported omission by Mr. Lawmaster is not readily apparent to us, given that there is no indication in the record that this unrecovered security footage would expose any information—favorable or otherwise—to which Mr. Lawmaster has not already described in detail in his deposition testimony. *See* Lawmaster Dep. 53:6–54:20, dkt. 35-1. Director Spivey, for his part, stops short of specifically asserting that the non-retention of certain footage was willful or intentional; to the extent that he insinuates otherwise, we regard such conjecture as baseless and immaterial to our ruling.

Spivey engaged in a course of conduct that the First Amendment squarely prohibits: He invoked his official authority (by displaying his badge and identifying himself as an investigator for the Attorney General's Office), condemned Mr. Lawmaster's expressive activities (e.g., "you crossed the line"), and reminded Mr. Lawmaster of the potential legal liability ("we could easily indict you over this today"). Dkt. 38 at 8 (citing *Speech First*, 968 F.3d at 642; *Backpage.com*, 807 F.3d at 230–32). Under these facts, Mr. Lawmaster's self-censorship is objectively reasonable.

The final component of Mr. Lawmaster's injury in fact concerns whether he has shown a credible threat of enforcement, meaning that his fears of future adverse actions are both actual and reasonable. *Brown*, 86 F.4th at 761. In asserting that Mr. Lawmaster faces no credible threat of enforcement, Director Spivey argues that the matter has been "put away" and that he has since "disavowed any attempt to arrest" or take future action against Mr. Lawmaster. Dkt. 34 at 19, 21. Director Spivey's arguments are not persuasive on two fronts. First, a review of the interaction between Director Spivey and Mr. Lawmaster reveals that Director Spivey considered the issue "put away" only after Mr. Lawmaster "agree[d] to tone it down a little bit." Video at 02:07–13, dkt. 27 (manual filing); *e.g.*, *id.* at 01:13–20 ("Maybe you and I can come to agreement that we kind of tone down the political rhetoric a little bit.").

Additionally, although a plaintiff may "lack a well-founded fear of prosecution when those who have authority to enforce the law have clearly disavowed any plans to prosecute the plaintiff . . . , the absence of a clear disavowal tends to support finding a credible threat of prosecution." *Brown*, 86 F.4th at 769. Director Spivey's purported disavowal here was far from clear and unequivocal—particularly because his decision not to pursue the matter further was contingent upon Mr. Lawmaster's agreement to modify his speech. *See* Spivey Dep. 60:14–24, dkt. 22-2 (testifying as to his conclusion that, following his conversation with Mr. Lawmaster, he "felt there was no

reason" to continue an investigation). Neither Director Spivey's statements to Mr. Lawmaster on May 1st nor his subsequent deposition testimony reveal what repercussions await Mr. Lawmaster should he reengage in his "86" comments. Thus, Director Spivey's asserted disavowal does not diminish Mr. Lawmaster's credible and well-founded fear of future adverse action being taken against him. *See Brown*, 86 F.4th at 769–70.

Redressability & Ripeness: Director Spivey's redressability and ripeness arguments are reiterations of those raised in his Motion to Dismiss. *Compare* dkt. 30 at 12–13, *with* dkt. 34 at 21–23. Plainly, Mr. Lawmaster's injuries can be redressed through an injunction prohibiting Director Spivey from taking adverse action against Mr. Lawmaster for protected speech that Director Spivey might disfavor. This dispute is also ripe: Mr. Lawmaster wishes to resume posting "86" comments online and to exercise his speech rights freely, which he currently is not doing on account of the directive he received from Director Spivey. In other words, Mr. Lawmaster's First Amendment interests have been "threatened [and] in fact [are] being impaired." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The controversy is both redressable and ripe.

*2. First Amendment Coercion*

We turn now to Mr. Lawmaster's likelihood of success on his First Amendment claim. At this stage of the analysis, "a mere possibility of success is not enough." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020). Thus, Mr. Lawmaster "must demonstrate that [his] claim has some likelihood of success on the merits, not merely a better than negligible chance." *Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020) (citation modified).

To determine whether Mr. Lawmaster has shown a likelihood of success, we return to the legal claim at the heart of this litigation; to wit, that Director Spivey infringed upon Mr. Lawmaster's First Amendment rights by "attempt[ing] to suppress [his] protected speech . . . by threatening

that legal sanctions will at [Director Spivey's] urging be imposed unless there is compliance with his demands." *Backpage.com*, 807 F.3d at 231. Because Mr. Lawmaster has established that Director Spivey's directive likely was coercive, we hold that he has shown a likelihood of prevailing on the merits.

"Considerations like who said what and how, and what reaction followed, are . . . helpful guideposts in answering the question whether an official seeks to persuade or, instead, to coerce." *NRA*, 602 U.S. at 191. Additional factors bearing on our totality-of-the-circumstances analysis include word choice and tone, the existence of regulatory authority, whether the speech was perceived as a threat, and whether the speech refers to adverse consequences. *Id.* at 189–90 (outlining the Circuit Courts' various approaches to "determin[ing] whether a challenged communication is reasonably understood to be a coercive threat").

Our review of the relevant circumstances in this case impels the conclusion that Mr. Lawmaster is likely to succeed in proving that Director Spivey's communication with him was coercive. For starters, "[t]he power that a government official wields, while certainly not dispositive, is relevant to the objective inquiry of whether a reasonable person would perceive the official's communication as coercive. *Id.* at 191 (citing *Bantam Books*, 372 U.S. at 66–67). "Generally speaking, the greater and more direct the government official's authority, the less likely a person will feel free to disregard a directive from the official." *Id.* at 191–92.

In this case, that Director Spivey lacks the authority to institute criminal proceedings is not contested. Dkt. 23 at 17. Director Spivey *can*, however, make arrests, initiate investigations, and refer matters to other law enforcement agencies with an aim towards prosecution. Spivey Dep. 20:21–21:24, 22:25–28:6, dkt. 22-2. Coupled with the fact that Director Spivey introduced himself to Mr. Lawmaster as "an investigator" and displayed a badge that could reasonably be perceived,

as Mr. Lawmaster did here, as indicating the bearer's law enforcement capacity, Director Spivey's authority, or at the very least his appearance of authority, is a significant illuminating factor to his communication with Mr. Lawmaster. *Id.* at 19:18–20:13, 62:24–63:15; Lawmaster Decl. ¶ 18, dkt. 22-1.

Against the backdrop of Director Spivey's official authority, the coerciveness of his word choice vis-à-vis his reference to potential adverse consequences is abundantly clear. As we have quoted throughout this entry, Director Spivey told Mr. Lawmaster (albeit politely, as Director Spivey reiterates) that he had "crossed the line . . . with a threat like" his "86" comment; stated that "we could easily indict you over this today"; and indicated that "*if*" Mr. Lawmaster "agree[d] to tone it down a bit, [he] c[ould] go check a box" and "let this one slide." Video at 01:09–13, 01:42–47, 01:50–02:00, dkt. 27 (manual filing) (emphasis added). Importantly, "[t]he Constitution does not distinguish between 'comply or I'll prosecute' and 'comply and I'll look the other way.' " *NRA*, 602 U.S. at 193 (dicta). Thus, that the parties' interaction was by both accounts relatively polite and civil does not detract from the conclusion that Director Spivey coerced Mr. Lawmaster by stating that if Mr. Lawmaster ceased posting his "86" comments, Director Spivey would ignore the "easily indict[able]" incident altogether. That is coercion by any reasonable measure.

Mr. Lawmaster's reaction in yielding to Director Spivey "further confirms the communication['s] coercive nature." *Id.* at 193. Since Director Spivey's visit, Mr. Lawmaster has ceased posting "86" comments and has refrained from engaging in state and national political debates. Lawmaster Dep. 70:21–75:18, 98:5–13, dkt. 35-1. Further reflecting that Mr. Lawmaster perceived Director Spivey's statements as a threat is the fact that in the immediate aftermath of their

encounter, Mr. Lawmaster contacted legal counsel, which indicates Mr. Lawmaster's genuine concern that his rights had been violated.[10]

In sum, Mr. Lawmaster has adequately demonstrated a likelihood of success on the merits of his claim that Director Spivey wielded his official power to coerce Mr. Lawmaster's silence and disengagement in protected expressive activities by levying veiled threats of potential adverse government action.

**C. Irreparable Harm & Inadequate Remedy at Law**

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373–74; *accord Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) ("The loss of First Amendment freedoms is presumed to constitute irreparable injury for which monetary damages are not adequate . . . ."). Injunctions are especially appropriate in the context of First Amendment violations because of the inadequacy of money damages." *Nat'l People's Action v. Vill. of Wilmette*, 914 F.2d 1008, 1013 (7th Cir. 1990). Because Mr. Lawmaster has shown a reasonable likelihood of success on his coercion claim, he has also necessarily established irreparable harm for which there is no adequate remedy at law.

Director Spivey rejoins that Mr. Lawmaster cannot satisfy a showing of irreparable harm because he has not suffered a litany of enumerated harms, such as physical injury, financial losses, lost employment or income, and the need for therapy, counseling, or medication. Dkt. 34 at 28–29. Even assuming any of the aforementioned injuries could qualify as an irreparable one for which traditional legal remedies (i.e., money damages) are inadequate, none defeats or diminishes the conclusion that the stifling of First Amendment freedoms to any degree is an irreparable injury.

---

[10] For reasons that are not readily apparent to us, Director Spivey also suggests that Mr. Lawmaster's failure "to delete his posts" "betrays" his claimed perception of Director Spivey's communication as coercive. Dkt. 34 at 24.

Additionally, Director Spivey's argument that Mr. Lawmaster's "self-restraint is driven by litigation strategy," *id.* at 29, is not persuasive: Mr. Lawmaster's silence underscores importance of the preliminary relief he seeks.

**D. Balance of Harms & Public Interest**

When the government is the party opposing the issuance of a preliminary injunction, the balance of equities and public interest considerations merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). "[I]njunctions protecting First Amendment freedoms are always in the public interest." *Walker*, 453 F.3d at 859.

Here, Director Spivey argues that an injunction would unduly "hobble the Attorney General's Office in performing a core public-safety function: assessing reported threats against elected officials." Dkt. 34 at 29. Director Spivey does not, however, elaborate as to how adhering to the principles of the First Amendment impinges on the discretion he needs to exercise in order to fulfil his public-safety functions. Nor can we discern an inherent incompatibility or tension between Director Spivey's legitimate public-safety functions and Mr. Lawmaster's requested injunction. After all, the challenged conduct in this case is not the bare fact of Director Spivey's "threat assessment" but rather the fact that he (more likely than not) utilized the investigation as an opportunity to do that which the First Amendment forbids—thwarting the protected speech of a private person by threatening the imposition of legal sanctions unless there was compliance with his demands. *See Backpage.com*, 807 F.3d at 230–31. Insofar as Director Spivey seeks to conduct investigations in a manner that infringes upon the First Amendment, as Mr. Lawmaster has shown to be likely here, then his "claimed harm is no harm at all." *Walker*, 453 F.3d at 867.

For the foregoing reasons, we conclude that the strength of Mr. Lawmaster's strong showing of likely success on the merits, irreparable harm, and the public interest in the vindication of

his First Amendment rights far outweighs any potential hindrance that Director Spivey might encounter in complying with an injunction. Injunctive relief shall enter in Mr. Lawmaster's favor accordingly.

### E. Bond

Because issuance of a preliminary injunction in this case will not impose monetary injuries upon Director Spivey, no injunction bond shall be required of Mr. Lawmaster. *See Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010).

## III. Terms of the Preliminary Injunction

"[T]raditional equitable principle[s]" provide "that injunctions should prohibit no more than the violation established in the litigation or similar conduct reasonably related to the violation." *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 841 (7th Cir. 2013). Similarly, Federal Rule of Civil Procedure 65(d) codifies the principle that "an injunction must 'state its terms specifically and describe in reasonable detail the act or acts restrained or required." *Id.* at 841–42 (quoting Fed. R. Civ. P. 65(d)) (citation modified).

Mr. Lawmaster's proposed injunction seeks to enjoin Director Spivey from "taking any adverse action against Mr. Lawmaster because of [his] past social media posts using '86' or future posts using '86' or from taking any adverse action against Mr. Lawmaster for using any language that does not amount to a true threat as defined by the United States Supreme Court." Pl.'s Mot. Prelim. Inj. 1, dkt. 10. The parties' submissions have for the most part glossed over the particulars of Mr. Lawmaster's proposed phrasing of the injunction. However, Director Spivey did include a passing comment in his reply brief in support of his motion to dismiss stating that asking "the Court to bar adverse action against speech 'that does not amount to a true threat as defined by the

United States Supreme Court' " is tantamount to an obey-the-law injunction, "which Rule 65(d) does not permit." Dkt. 36 at 7 (citing *AutoZone*, 707 F.3d at 841).

The current iteration of Mr. Lawmaster's proposed preliminary injunction—namely, its nonspecific reference to "language that does not amount to a true threat"—presents potential over-breadth and vagueness concerns that could and predictably would accompany so-called "obey-the-law" injunctions. *See AutoZone*, 101 F.3d at 841–42. To avoid any ambiguity that might hinder compliance with and the enforcement of this injunction (and to quell Director Spivey's concerns about his continued ability to perform his "public safety function"), we shall tailor Mr. Lawmaster's proposed injunction to the particular speech and conduct at issue in this case.

As revealed by the instant record, the speech at issue in this litigation was Mr. Lawmaster's "86" comments and (what Director Spivey described as) "political rhetoric"; and the conduct which Mr. Lawmaster seeks to restrain is the (likely) coercive methods by which Director Spivey effectively curtailed "the dissemination of ideas or opinions thought to be dangerous or offensive" by "[t]hreatening penalties for future speech . . . ." *Backpage.com*, 807 F.3d at 235 (citation modified). Accordingly, a preliminary injunction which mirrors that directed by the Seventh Circuit in *Backpage.com* would provide that Director Spivey be enjoined from taking any action, formal or informal, to coerce or threaten Mr. Lawmaster with legal sanctions intended to suppress and/or punish Mr. Lawmaster for his past and future social media posts containing the phrase "86" and/or related political rhetoric. We shall and do adopt that format in our preliminary injunction as set forth in the accompanying order.

## CONCLUSION

Upon consideration of the parties' briefs and supporting evidence, Mr. Lawmaster's Motion for Preliminary Injunction is hereby **GRANTED**. Dkt. 10. A preliminary injunction shall issue by separate entry.

Additionally, Director Spivey's Motion to Dismiss is hereby **DENIED**. Dkt. 29.

This matter shall proceed accordingly.

IT IS SO ORDERED.

Date: 10/20/2026

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Joshua Bleisch
American Civil Liberties Union of Indiana
jbleisch@aclu-in.org

James Compton
First & Fourteenth PLLC
james@first-fourteenth.com

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Timothy Michael Hamilton
Office of Indiana Attorney General
timothy.hamilton@atg.in.gov

Katherine A Meltzer
Office of Indiana Attorney General
katherine.meltzer@atg.in.gov

Andrew Nussbaum
First & Fourteenth PLLC
andrew@first-fourteenth.com

Stevie J. Pactor
ACLU OF INDIANA
spactor@aclu-in.org

Adrienne Nicole Pope
INDIANA ATTORNEY GENERAL
adrienne.pope@atg.in.gov

Gavin Minor Rose
ACLU OF INDIANA
grose@aclu-in.org